James **COVENTRY**, William **Bryer–opt–in Plaintiff,**

v.

**UNITED STATES STEEL CORPORATION Pennsylvania Human Relations Commission, Applicant for intervention on behalf of plaintiff.**

*Appeal of Ronald HALLAS, one of the "opt-in" plaintiffs.*

**No. 87–3222.**

United States Court of Appeals, Third Circuit.

Argued Oct. 23, 1987.

Decided Aug. 26, 1988.

alleged to have violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1982) ("ADEA"), by its termination of the Appellant's employment. Appellant asserts that the district court committed error by refusing to grant his motion to amend his complaint, and by concluding that Appellant's execution of a claim release form, in order to obtain pension benefits, constituted a "voluntary and knowing" waiver of his claims under the ADEA and thus, that the employer's failure to pay those benefits when the Appellant refused to withdraw his age discrimination complaint did not constitute retaliation in contravention of the ADEA.

We conclude that Appellant's motion to amend his complaint was improperly denied. Accordingly, we will vacate the district court's order and remand with instructions that the motion to amend be granted. Further, we hold that the circumstances under which Appellant signed the release form do not evidence the requisite knowledge by the Appellant to constitute a knowing and willful waiver of his claims. We will, therefore, reverse the district court's finding to the contrary and remand for rehearing on the claim of retaliation.

## I.

We are once again presented with the task of interpreting the ADEA in a manner that effectuates Congress's intent to proscribe discrimination against older persons because of age, and also provides reasonable latitude to employers in the management of their businesses. Appellant, Ronald Hallas,[1] began his employment with Appellee, the United States Steel Corporation ("USS") in 1947 as a laborer in USS's Coke and Chemical Production facility in Clairton, Pennsylvania ("Clairton Works"). During the more than 35 years of his employment with USS, Hallas worked in various job capacities and received several mer-

David B. Mulvihill (argued), Mansmann, Cindrich and Titus Pittsburgh, Pa., for appellant.

Richard J. Antonelli (argued), USX Corp. Law Dept. Pittsburgh, Pa., for USX Corp.

Before: HIGGINBOTHAM, SCIRICA and HUTCHINSON, Circuit Judges.

### OPINION OF THE COURT

A. LEON HIGGINBOTHAM, JR., Circuit Judge.

This is an appeal from the judgment of the district court in favor of an employer

---

1. After filing his complaint with the EEOC, Hallas elected to join a class action that had been initiated by James Coventry. The class was subsequently severed into groups and the several group actions were tried separately. On this appeal we are asked to review only the claims asserted by Hallas.

it-based salary increases and promotions. In July, 1982 he was laid off during a reduction in force attributed to a major cutback of operations at the Clairton Works. At that time, Hallas was employed as a foreman within the chemicals department. In August, 1982, Hallas filed a charge with the Equal Employment Opportunity Commission in which he alleged that he had been selected for lay-off because of his age, and that USS had retained a number of younger employees to do jobs that Hallas had performed or was qualified to perform.

In or about late October, 1982, Hallas was advised by the assistant superintendent of the Clairton Works that USS was permanently terminating his employment. Jt.App. at 64. He was also told that, in light of his service with USS, he would qualify for the so-called "70/80" mutual agreement pension benefit[2] if he would execute a form entitled "Application and Release for 70/80 Retirement Under Mutually Satisfactory Conditions," which was commonly referred to as the "PF–116–B." The PF–116–B contained a release of all claims that an employee had against USS pursuant to the ADEA and a waiver of any such claims that might in the future be determined to exist.[3] It provided that the employee would "not file or permit to be filed on [his or her] behalf any such claim." Jt.App. at 157. Further, it provided that the employee would "not permit [himself or herself] to be a member of any class seeking relief and [would] not counsel or assist

in the prosecution of claims against the releases, whether those claims are on behalf of [him or her] or others." *Id.* The form also stated that "[i]f any such claim has been filed by [the signing employee] or included [him or her] in its coverage for relief, [he or she] agree[d] to voluntarily withdraw such claim and otherwise agree[d] not to participate in such claim." *Id.*

Hallas was instructed to schedule a meeting with a representative of USS's personnel department to discuss the options available to him regarding his separation from the company. On November 2, that meeting occurred between Hallas and Robert Yost. Yost advised Hallas that Hallas qualified for the 70/80 mutual option pension, but that he could not elect that option without executing the PF–116–B release. Although Hallas expressed his desire to become eligible for the pension option, he refused to sign the PF–116–B. Hallas later testified that he refused to sign the form because he had doubts about its legality. Jt.App. at 94. The meeting between Hallas and Yost concluded without resolution of Hallas's pension entitlement. On November 11, Hallas returned to USS and met with the general supervisor of personnel training, Robert Wilson, who advised Hallas that the only options available to him were accepting the 70/80 pension (and signing the PF–116–B) or being placed on a two-year lay-off. Jt.App. at 88. Wilson advised Hallas that if he chose the latter

---

**2.** The record indicates that USS had three special early retirement pension benefits plans. The two plans that are of particular importance to this appeal are the "70/80 mutually satisfactory conditions" plan, and the "70/80 two-year break in service" plan.

These plans were referred to as "70/80" plans because they contained eligibility provisions that were predicated either upon the employee's having a combined age and duration of service equalling at least 70 years or a combined age and duration of service that totalled at least 80 years. The threshold qualification requirement was that the employee have worked at least 15 continuous years with USS and be under the age of 62. If the employee was 55 years or older he or she needed to have a combined age and number of years of continuous service that totalled 70 or more. If the employee was younger than 55, he or she would need to have a com-

bined age and number of years of continuous service that totalled 80 or more.

Employees who met the age and length of service requirements received a pension under the "mutual option" plan if USS and the employee consented to the terms of separation. He or she received a pension under the "break in service" plan if he or she was laid off for a contiguous two year period. Eligibility for the latter of these two plans was automatic for any employee who satisfied the age and condition requirements. Only the mutual option plan required USS's consent prior to eligibility.

**3.** The form also contained a waiver and release of the employee's rights under Title VII, *see* 42 U.S.C. § 2000e *et seq.* (1982), and of all state and federal causes of action relating to the circumstances of the employment termination.

option, in addition to not receiving any compensation from USS during the lay-off, his hospitalization coverage would cease. *Id.* Moreover, Wilson told Hallas that he would be required to accept any job that became available during the lay-off period. At the conclusion of his meeting with Wilson, Hallas signed the election form for the 70/80 pension but *again refused to sign the PF–116–B. See* Jt.App. at 87–88. On November 19, he amended his discrimination charge with the EEOC to include an allegation regarding the requirement that employees sign the PF–116–B as a condition to 70/80 pension eligibility. (*See* Jt.App. at 77, 80–81, 94, 160). On November 29, Hallas returned to USS and met again with Wilson. At this meeting, he signed the PF–116–B form and was advised that he would begin receiving the pension.

Nearly two months followed during which Hallas did not receive any pension benefits or other compensation from USS. In late January, 1983, Hallas contacted the USS personnel office to inquire about the status of his pension and was told by Wilson that USS had reconsidered its decision to offer Hallas the 70/80 plan because Hallas had failed to withdraw his age discrimination complaint. Jt.App. at 89, 108.

In or about June, 1983, Hallas "opted in" as a party plaintiff in an action that had been previously filed by James Coventry, also a former employee at USS, that alleged various violations of the ADEA. That class action was subsequently severed into discrete groups and the actions tried separately. After discovery and pretrial pleadings, a bench trial of the claims raised by the group to which Hallas had been assigned began on February 5, 1987. The trial concluded on that same day and, approximately three weeks later, a verdict in favor of USS was entered on February 23, 1987. In its decision, the district court concluded that, although Hallas had established a *prima facie* case of age discrimination, he had failed to demonstrate that the non-discriminatory reason that USS had asserted for his discharge was pretext. *Coventry v. United States Steel*, No. 83–977 (W.D.Pa. Feb. 23, 1987) slip op. at 4–5, *reprinted in* Jt.App. at 161–62.

Hallas now appeals from that verdict. He alleges that the district court erred first by refusing to allow him to amend his complaint in July 1986 to allege that USS's pension policy contravened the provisions of the ADEA. He also asserts that the district court's conclusion that he had executed a valid waiver of ADEA claims was erroneous. We have reviewed each of these contentions and conclude that the decision of the district court is in error. We will, therefore, vacate its judgment and remand for further proceedings in light of this opinion.

## II.

■ In the present case, we are asked to give guidance to the courts of this circuit regarding whether, and under what circumstances, employees may validly waive their rights under the ADEA. That issue has been addressed by other courts of appeals, and there has been general consensus that the private settlement of claims is not inconsistent with the ADEA. *See, e.g., Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir.) (*en banc*) (there is not an absolute bar to release of claims under the ADEA despite similarities between that act and the Fair Labor Standards Act, for which there is an absolute bar against the waiver of claims), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986); *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539 (8th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987) (same). This court, however, has yet to address this issue.[4] *But cf. Sullivan v.*

---

4. We note that a district court within our circuit has addressed this issue. *See Valenti v. Int'l Mill Services, Inc.*, 610 F.Supp. 36, 37 (E.D.Pa.1985) (holding that ADEA claims may be released, but) "[b]ecause of Congress' activities in regulating age discrimination by enactment of the ADEA, courts must place a higher burden on individuals who seek to have such rights waived." That decision was appealed to this Court and affirmed. *See Valenti v. Int'l Mill Services, Inc.*, Nos. 86–1367, 86–1394, 86–1478, 86–1479, 86–1600, and 86–1601, slip op. (3d Cir. Dec. 29, 1987). A motion for rehearing *in banc* of the appeal was granted and, pursuant to the

*Boron Oil Co.,* No. 87–3238, slip op. at 2 (3d Cir. Sept. 30, 1987) [831 F.2d 288 (Table) ] ("a knowing and voluntary release of rights conferred by federal employment discrimination statutes will be enforced.") We now do so, and hold that, subject to a close evaluation of various factors that are indicia of "knowing" and "willful" waiver, employees may execute valid waivers of their ADEA claims.

Related to that issue, and somewhat of a preliminary matter, is Hallas's assertion that the district court erred by denying his motion to amend his complaint so that he could assert a claim that USS's policy of denying severance benefits to retired employees, who were eligible for the 70/80 mutual pension benefit but did not waive their age discrimination claims, violated the ADEA. That claim is significant to the question of whether Hallas executed a valid waiver of his ADEA claim in that USS's denial of severance benefits to him, since he was "eligible" for the 70/80 pension, perhaps illustrates further the conundrum that Hallas faced when he was advised to execute the PF–116–B. For that reason, the denial of Hallas's motion to amend provides the starting point for our discussion.

### a. Denial of Hallas's Motion to Amend

■ In July, 1986, Hallas moved to amend his complaint to allege that USS's policy of denying severance benefits to older employees who were eligible for retire-

ment violated the ADEA. The claim arose from a provision contained in USS's "Severance Pay Program for Management Employees," which was the company's plan outlining the benefits that were available to retiring or otherwise severed employees who had been with USS for three or more continuous years. *See* Jt.App. at 38. This severance plan provided in pertinent part that "[a] participant otherwise eligible for severance pay shall not be eligible for severance pay if he is eligible for immediate pension under the Non–Contributory Pension Rules applicable to him." Jt.App. at 41. Hallas asserts that he sought to add a claim in 1986 challenging the legality of this provision because that claim had become cognizable in light of a decision by the District Court for the Eastern District of Pennsylvania, which had construed a similar provision as violative of the ADEA. *See E.E.O.C. v. Westinghouse Elec. Corp.,* 632 F.Supp. 343 (E.D.Pa.1986), *appeal docketed,* No. 86–1226 (3d Cir.1986). The district court denied Hallas's motion to amend, apparently because it was made after considerable proceedings in this case had already transpired. The district court did not, however, identify any particular prejudice that would result from permitting the amendment. For that reason, we are persuaded that its decision was in error.

■ The decision to grant or deny leave to amend a complaint is committed to the sound discretion of the district court. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct.

---

rules of our Court, the decision of the panel was vacated. *See* Internal Operating Procedures of the United States Court of Appeals for the Third Circuit Chapter 9, Rehearing, § 4(d). Immediately prior to the *in banc* hearing of that appeal, however, the parties entered into a voluntary settlement of the dispute and, therefore, the appeal was dismissed. As a result, although this issue is not foreign to our Court, there is no controlling precedent that addresses it. *But cf. Erie Telecommunications v. City of Erie, Pennsylvania,* 853 F.2d 1084 (3d Cir.1988). In that recent decision, a panel of this Court analyzed the validity of a contractual waiver of first amendment rights and construed the Supreme Court's decisions in *Overmyer Co. v. Frick Co.,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972) and *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) as

stand[ing] for the proposition that constitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver.

*Erie Telecommunications, Inc.,* 853 F.2d at 1096. The Court held further that

Such volition and understanding are deemed to be, and indeed have been held to be, present, where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and has engaged in other contract negotiations.

*Id.* at 1096.

227, 230, 9 L.Ed.2d 222 (1962). As the Court in *Foman* noted, however, the "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id. See also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 329, 91 S.Ct. 795, 801, 28 L.Ed.2d 77 (1971); *Howze v. Jones & Laughlin Steel,* 750 F.2d 1208, 1212 (3d Cir.1984); *Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 938–39 (3d Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 150 (1984). Absent an "apparent or declared" reason for the denial, the leave to amend "should, as the rules require, be 'freely given.'" *Foman,* 371 U.S. at 182, 83 S.Ct. at 230 (quoting Fed.R. Civ.P. 15(a)). *See also Heyl & Patterson International, Inc. v. F.D. Rich, Inc.,* 663 F.2d 419, 425 (3d Cir.1981) ("'Courts have shown a strong liberality ... in allowing amendments under Rule 15(a)'" (quoting 3 Moore's Federal Practice ¶ 15.08(2) (2d ed. 1980)), *cert. denied, sub nom. F.D. Rich Housing of the Virgin Islands, Inc. v. Gov't of the Virgin Islands,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982)).

Among the reasons delineated by the Supreme Court in *Foman* as sufficient to support a denial of a motion to amend were "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or the] futility of the amendments." *Foman,* 371 U.S. at 182, 83 S.Ct. at 230.

In the present case, as rationale for its order, the district court noted only that "discovery having closed on November 30, 1984 [approximately eight months prior to the filing of the motion to amend], and the case being on this Court's current trial list," denial of the motion was proper. Jt. App. at 50. Thus, although the district court's reasoning is not precisely delineat-

ed, it appears that the denial of Hallas's motion to amend was predicated on the grounds of prejudice to USS and undue delay of the proceedings. Significantly, however, the district court did not point to any specific manner by which USS would have been prejudiced by the amendment, nor did it express any finding that the allowance of the amendment would, in fact, cause delay. For these reasons, we cannot conclude that its denial of Hallas's motion was founded upon a reasonable exercise of discretion.

The district court's apparent concern about any prejudice to USS that would result from the allowance of Hallas's amendment is consistent with this Court's prior interpretations of Fed.R.Civ.P. 15(a)'s amendment provision. *See Heyl,* 663 F.2d at 425 (the potential for "undue prejudice [to the non-moving party] is 'the touchstone for the denial of the leave to amend.'") (quoting *Cornell & Co., Inc. v. Occupational Safety and Health Review Commission,* 573 F.2d 820, 823 (3d Cir.1978)). In the present case, however, the nature of the claim that Hallas sought to add by his amendment indicates that no additional discovery would have been necessary.[5] More importantly, it appears that any additional discovery that USS might have been required to produce would not have been unduly burdensome since it would have concerned the same subject matter as an issue already in the case (the validity of the various provisions of the 70/80 mutual pension plan), and about which discovery had previously occurred. Certainly USS cannot claim that it was not on notice that the question of the propriety of its policy regarding the pension plan would be an issue in the case. That issue permeates Hallas's claim of retaliation, and the presence of that claim indicates that USS would not have been unduly prejudiced if it had been required to respond to Hallas's amended complaint.

---

5. Hallas states that "[i]f leave to amend had been granted, the sole question would have been whether that policy [requirement that eligible employees waive claims in order to receive the

70/80 mutual pension plan] violated the ADEA.... [L]ittle, if any, additional discovery would have been required." *See* Appellant's Brief at 14.

The district court's order also makes reference to the fact that the case was on the trial list at the time that Hallas made his motion to amend. Presumably, this reference indicates the district court's view that undue delay would have resulted from the allowance of the motion. The court did not, however, find that any delay would have actually resulted,[6] and neither did it demonstrate specifically the way in which such a delay would have caused undue prejudice to USS. *See, e.g., Cornell,* 573 F.2d at 823 ("[d]elay alone ... is an insufficient ground to deny an amendment, unless the delay unduly prejudices the non-moving party."); *Howze,* 750 F.2d at 1212 (same). *Cf. Jenn–Air Products Co. v. Penn Ventilator,* 283 F.Supp. 591 (E.D.Pa.1968) (unexplained delay in bringing cause of action sought to be added by amendment is not ground for denying motion to amend unless defendant is prejudiced, and prejudice ordinarily is not considered to have occurred unless motion is made during or after actual trial).

It is certainly not inconceivable to us that instances could occur in which the failure to make a timely motion to amend a complaint would place an unwarranted burden upon a trial court, or be prejudicial to the party opposing the motion. In such circumstances, however, the obligation of the trial court in its disposition of the motion is to articulate the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reason for delay in asserting the motion. *See Adams v. Gould, Inc.,* 739 F.2d 858, 868–69 (3d Cir.1984), *cert. denied,* 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). In the present case, the reason that Hallas asserts for delay in moving to amend his complaint is that the issue that he sought to raise was unsettled in the courts. He argues

that prior to the decision in *E.E.O.C. v. Westinghouse Electric Corp.,* his claim of discrimination in the application of the 70/80 pension plan was not available to him. *See* Appellant's Brief at 10–11. We note that other federal courts have held that new decisional law that intervenes between the start and conclusion of an action is a sufficient reason to permit an amendment to a complaint and allow the inclusion of a new cause of action. *See, e.g., State Teachers Retirement Board v. Fluor Corp. and Manufacturer's Hanover Trust Co.,* 654 F.2d 843 (2d Cir.1981); *Marcera v. Chinlund,* 91 F.R.D. 579 (W.D.N.Y.1981). The circumstances of *Marcera* are similar to those of the present case. In *Marcera,* the district court permitted an amendment to a complaint that had been filed two years earlier so that the plaintiff could add a pendant state constitutional claim that had been resolved beneficially to his claim in an unrelated state case subsequent to the filing of his complaint. In its determination that leave to amend should be granted, the district court concluded that the

> plaintiff's amendment will not work any undue burden or hardship on [the] defendants. The proposed additional claim relies on the identical facts as those underlying plaintiff's federal claim. No new problems of proof will result. The new claim will not involve much new discovery, if any ... [a]t most, defendants will now be responsible for analyzing and assessing the applicable state law ...

*Marcera,* 91 F.R.D. at 581. This rationale appears equally applicable to the present case particularly in light of the absence of an articulation of actual prejudice to USS that resulted from the timing of Hallas's motion.[7] For these reasons, we will vacate

---

6. We note that the order denying the motion to amend was entered in August, 1986, almost six full months prior to the beginning of trial in late January, 1987.

7. USS asserts that the district court did not rest its decision solely on the grounds of delay and prejudice. It argues that, in addition to making specific reference to the facts that discovery had closed and that the case was listed for trial, the district court's order also stated "upon further

consideration of [USS's] Opposition." Jt.App. at 50. USS argues, therefore, that the district court's order should be construed as being predicated upon *each* of the contentions that it had advanced in opposition to Hallas's motion. USS states that the principal reason that it asserted to the district court for denial of the motion was that the amendment would be futile because the cause of action that Hallas sought to raise would be time barred by the 300/30 day limitations for filing to the E.E.O.C., *see* 29 U.S.C.

the district court's order and remand for entry of an order granting Hallas leave to amend his complaint.

### b. Waiver of Claims Under the ADEA

 The question of whether Hallas's individual claim of discrimination under the ADEA is precluded by a valid waiver is more difficulty resolved. At the threshold, that issue raises the question of what constitutes a valid waiver. In this inquiry, we are reminded of Justice Black's guidance that " '[w]aiver' is a vague term used for a great variety of purposes, good and bad, in the law. In any normal sense, however, it connotes some kind of voluntary knowing relinquishment of a right." *Green v. United States*, 355 U.S. 184, 191, 78 S.Ct. 221, 226, 2 L.Ed.2d 199 (1957). These criteria of "knowing" and "willing" have been usefully applied to evaluate the validity of releases in other important contexts and, in our view, they are equally useful to the determination of the validity of releases of ADEA claims.[8]

§ 626(d) (1982), and by the statutory period for filing in the federal court pursuant to 29 U.S.C. § 626(e) (1982).

This argument fails on several levels of analysis. First, it requires too much reading into, and too little reading of, what the district court said. The fact that the district court "considered" USS's arguments does not mean that it adopted them. Indeed, the fact that it "considered" all of USS's contentions, but chose to enumerate only two bases for its decision, supports an equally plausible argument that the district court rejected the remainder of USS's contentions. Second, even were we to accept the strained interpretation of the district court's order that USS urges, the argument that Hallas's claim was futile is not persuasively made. . Hallas could have asserted the "relation back" provisions of Fed.R.Civ.P. 15(c) to avoid dismissal on limitations grounds, and in view of the liberal construction that has been given to that provision, and the nature of the claims that Hallas had already pleaded, it does not appear that allowance of his motion to amend would have been a futile endeavor. *Cf. Faust v. RCA Corp.*, 612 F.Supp. 540, 543-44 (M.D.Pa.1985) (amended complaint that alleged discriminatory discharge in violation of the Labor Management Relations Act related back for limitations purposes to the original complaint in which the allegation was that the employee was discharged arbitrarily and capriciously without just cause, since the new claim arose out of substantially the same occurrence, and the defendant should have been able to anticipate a claim like that contained in the amendment). Moreover, although not dispositive of our consideration, it is certainly noteworthy that Hallas was permitted to amend his filing to the E.E.O.C. to include the claim concerning the 70/80 pension plan immediately prior to the time that he sought to amend his complaint in the district court. *See* Jt.App. at 74-75, 94.

8. There is an alternative view of the issue of waiver of ADEA claims that argues that the policies supporting the ADEA are properly construed like those upon which the Fair Labor Standards Act, 29 U.S.C. §§ 206-209 (1982) ("FLSA") is predicated, and that the ADEA, like the FLSA, should be read to preclude complete-ly private waivers of rights guaranteed by its anti-discrimination provisions. *See Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945); *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1946). That view is predicated on the theory that the significant incorporation of the FLSA's enforcement and damages liability provisions into the ADEA (§ 626(b) of the ADEA incorporates §§ 211(b), 216 (except for subsection (a)), and 217 of the FLSA) should lead also to interpretation of the ADEA consistently with the FLSA in areas where the ADEA is not explicit. The argument is that Congress was aware of the judicial interpretation that had been given to the FLSA when it referred to that statute in enacting the ADEA, and anticipated that the ADEA would be interpreted consistently. *See Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

The only decision by a federal appellate court of which we are aware that has specifically endorsed this view is the decision of the panel of the Court of Appeals for the Sixth Circuit in *Runyan* that was subsequently vacated by the court *en banc*, *see Runyan v. National Cash Register Corp.*, 37 Fair Empl.Prac.Cas. (BNA), 1086, *reh'g granted*, 38 Fair Empl.Prac.Cas. (BNA) 5 (6th Cir.1985), and replaced by a decision of the full court that specifically rejected the view. *See Runyon*, 787 F.2d at 1044. *Cf. E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir.1987) (release of claims for damages or other relief not precluded, but "waiver of right to file charge [with the EEOC] is void as against public policy.") We are unpersuaded, however, that the policy concerns of the FLSA that the Supreme Court sought to advance by its decisions in *Gangi* and *O'Neil* are present in ADEA cases such that a *per se* rule against releases is necessary. Most significant, perhaps, among those policy concerns is the fact that the principal rights that the FLSA was designed to protect—minimum wages and maximum work hours—effect a public policy that Congress intended to be absolute. Validation of releases that allowed employers and employees to compromise those rights would undermine the statute itself. *See Gangi*, 328

Our test to determine whether or not the release of ADEA claims is valid is grounded in the analysis that has been applied to claims arising under Title VII, 42 U.S.C. § 2000e *et seq.*, that an employee may validly waive claims of discrimination so long as the waiver is made "knowingly and willfully." *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

In Title VII cases, the determination of whether a waiver has been "knowingly and willfully" made has been predicated upon an evaluation of several indicia arising from the circumstances and conditions under which the release was executed. Among those factors relied upon to indicate a valid waiver are general principles of contract construction such as the clarity and lack of ambiguity of the language, *see Pilon v. University of Minnesota*, 710 F.2d 466 (8th Cir.1983), and the absence of fraud

or undue influence. *See Rogers v. General Electric Co.*, 781 F.2d 452 (5th Cir.1986). We note that many of these principles have already been applied in the decisions of federal appellate courts to date that have addressed the question of waiver of claims under the ADEA. *See Runyan*, 787 F.2d at 1044 n. 10 ("In determining whether plaintiff knowingly and voluntarily waived his ADEA claims, we apply ordinary contract principles."); *Lancaster*, 809 F.2d at 541 (same); *Moore v. McGraw Edison Co.*, 804 F.2d 1026, 1033 (8th Cir.1986) (private settlement of fact dispute under the ADEA is valid "in the absence of fraud, deceit, or unconscionable overreaching."). We agree that this evaluation is necessary and useful, but in our view, the inquiry into the validity of a release of discrimination claims does not end with the evaluation that would be applied to determine the validity of a contract.[9] In light of the

---

U.S. at 116, 66 S.Ct. at 929. We note coincidentally that is was only the release of claims concerning the *rights* granted by the FLSA, and not the release of claims grounded in factual disputes, that the Supreme Court held were precluded. Thus, although we conclude that the interpretation given to the FLSA should inform the decision regarding the proper manner to interpret the ADEA, we cannot conclude that an absolute bar against private settlement of claims that arise under the ADEA best effectuates the purposes of that statute.

The ADEA was designed to provide protection to older persons from discrimination because of their age, and it appears that Congress intended that resolution of disputes arising under the act would be expeditiously achieved. *See* ADEA § 2(b). Moreover, the legislative history reflects the intent of the act's sponsors to achieve swift disposition of disputes and to avoid delays which, as one sponsor noted, "plague so many of our agencies, such as the EEOC and the NLRB. The EEOC, for example, is already years behind in disposing of its docket. Such delay is always unfortunate, but is particularly so in the case of older citizens to whom, by definition, relatively few productive years are left." *Age Discrimination in Employment: Hearings on S. 830 and S. 786 Before the Subcommittee on Labor of the Senate Committee on Public Welfare*, 90th Cong., 1st Sess. 24–25 (1967) (Remarks of Sen. Jacob Javits (N.Y.)). Another sponsor of the legislation, Senator Williams of New Jersey, noted that the Act should allow the employee to "resolve the dispute himself or work out a compromise with an employer." 123 Cong.Rec. S17275 (daily ed. Oct. 19, 1977) (Remarks of Sen. Harrison Williams (N.J.)). Additionally, we note that the EEOC has en-

dorsed the utilization of private waivers as an efficient means towards the expeditious resolution of claims, *see* R. Silberman & C. Bolick, *The EEOC's Proposed Rule on Releases of Claims under the ADEA*, 37 Lab.L.J. 195 (1986), and has promulgated rules that the ADEA, 37 Lab.L.J. 195 (1986), and has promulgated rules that establish guidelines and standards to assist employers and employees in the utilization of release agreements. *See* 29 C.F.R. § 1627 (eff. Sept. 28, 1987) (text *reprinted in,* 52 Fed.Reg. 32296 (August 27, 1987)), *but see* 53 Fed.Reg. 3370 (Feb. 5, 1988) (Notice of congressional action regarding final rule on ADEA waivers) (Public Law 100–202 (appropriations for fiscal year 1988) providing that EEOC rule regarding unsupervised waivers under ADEA shall not have effect during fiscal year 1988).

In view of these facts, we are persuaded that voluntary waiver of claims does not contravene the policies underlying the ADEA and, therefore, we hold that private waivers are not precluded by that act. We note, however, that in the evaluation of the validity of such waivers we will carefully review the circumstances in which they were entered in light of the tests of voluntariness and knowledge that have been applied to releases of claims under Title VII.

9. We note, incident to this discussion, that although the Court of Appeals for the Sixth Circuit noted in *Runyan* that evaluation of the sufficiency of waivers of ADEA claims is made by the application of contract principles, a reading of that court's opinion in its entirety reflects the fact that the court considered other factors, among them the fact that the plaintiff himself was a lawyer. Indeed, in the sentence immedi-

strong policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, considerate of the particular individual who has executed the release, is also necessary. *See, e.g., Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1172 (5th Cir.) ("[t]o assume that, notwithstanding strong evidence to the contrary, a signature implies understanding is to allow a rule of contract law to play too salient a part in the administration of a remedial civil rights statute."), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976). Careful evaluation of the release form itself, and of the complete circumstances in which it was executed, is necessary to assure that the goals of the ADEA are preserved. Toward that end, we. find a decision of the District Court for the Southern District of New York helpful because of its enumeration of specific indicia of voluntariness. *See E.E.O.C. v. American Express Publishing Corp.*, 681 F.Supp. 216 (S.D.N.Y.1988). In that case, the district court reviewed a complaint filed by the EEOC on behalf of a former employee of American Express Publishing. The employee had filed a complaint with the EEOC alleging that American Express Publishing had terminated his employment in order to avoid the vesting of a new pension plan for him.

681 F.Supp at 218. American Express sought dismissal of the complaint on the grounds that the employee had executed a release of his claims under the ADEA in exchange for compensation. In its evaluation of the validity of the waiver, the court held that the

> [d]etermination [of] whether a release is voluntary depends on: 1) the plaintiff's education and business experience, 2) the amount of the time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Id.* at 219 (citing *Lancaster; DiMartino v. City of Hartford*, 636 F.Supp. 1241 (D.Conn.1986)).[10] In its review, the district court considered the totality of the circumstances in which the release was executed. Application of the enumerated. factors to the case before it led the district court to conclude that specific findings of material facts required adjudication and, therefore, that summary judgment was inappropriate.

---

ately preceding the footnote in which it stated that regular contract principles should be applied in the determination of whether the waiver of claims was valid, the court noted that "[t]he release in this case was knowingly and deliberately executed by an attorney knowledgeable in labor law and employment discrimination matters." *Runyan*, 787 F.2d at 1044.

**10.** *Compare* EEOC rule regarding specific exemptions from the requirement that it supervise the disposition of claims raised pursuant to the ADEA:

> (c)(1) … it has been found necessary and proper in the public interest to permit waivers or releases of claims under the Act without the Commission's supervision or approval, provided that such waivers or releases are knowing and voluntary, do not provide for the release of prospective rights or claims, and are not in exchange for consideration that includes employment benefits to which the employee is already entitled.
> (2) When assessing the validity of a waiver agreement, the Commission will look, and is likely to find supportive, the following rele-

vant factors that courts have previously identified as indicative of a knowing and voluntary waiver:

> (i) The agreement was in writing, in understandable language, and clearly waived the employee's rights or claims under the ADEA;
> (ii) A reasonable period of time was provided for employee deliberation;
> (iii) the employee was encouraged to consult with an attorney.

These are not intended as exclusive nor must every factor necessarily be present in order for a waiver to be valid, except that a waiver must always be in writing. Moreover, even where these three factors are present, if a waiver is challenged, the Commission will look to the substance and circumstances to determine whether there was fraud or duress. 29 C.F.R. § 1627.16 (eff. Sept. 1987) (text *reprinted in*, 52 Fed.Reg. 32296) (August 27, 1987); *but see* 53 Fed.Reg. 3370 (Feb. 5, 1988) (Notice of congressional action regarding final rule on ADEA waivers) (Public Law 100–202 (appropriations for fiscal year 1988) providing that EEOC rule regarding unsupervised waivers under ADEA shall not have effect during fiscal. year 1988).

In the present case, this same rationale is compelling. Therefore, we adopt the view that in the determination of whether a waiver was signed knowingly and voluntarily, review of the totality of the circumstances in which it was signed must be had. Application of that test to the present case leads us to conclude that there has not been a sufficient factual showing that Hallas executed the PF–116–B form knowingly and willingly.

The district court concluded that Hallas "knowingly and voluntarily signed Form PF–116–B on November 29, 1982, being aware that by so doing he agreed to voluntarily withdraw any charges of age discrimination which he had filed against defendant." *Coventry v. United States Steel Corp.*, No. 83–977 (W.D.Pa. Feb. 23, 1987), slip op. at 3, *reprinted in* Jt.App. at 160 (Findings of Fact ¶ 26). The district court did not explain in any detail the criteria that it used to reach its conclusion and the record on this appeal does not give us any basis to conclude that it evaluated any of the factors that we have set forth or any other indicia of knowledge or willfulness. We assume that the district court based its decision, at least in part, on its determination that the release was written in clear, specific language and that Hallas was competent enough to read and understand its literal meaning. As we have stated, however, that inquiry is not enough. Additional factors, which take into account the complete circumstances in which the release was executed, must also be evaluated.

■ We note first in that regard that the decision with which Hallas was presented in his meetings with Yost and with Wilson appears to have been little more than a "Hobson's choice." Hallas testified that he was advised by Wilson that his only options were accepting the mutual option pension benefits, and foregoing his claims, or being placed on automatic lay-off and losing his income and hospitalization benefits immediately. Jt.App. at 88. Moreover, in light of USS's policy of denying severance benefits to persons who were "otherwise eligible" for a pension plan, Hallas could not opt to have his employment terminated completely and take severance benefits. "Hallas's choice," therefore, after thirty-five years of service, was between a lay-off of uncertain duration,[11] that would bring the certain cessation of his income, and an early retirement plan that would make pension benefits available to him only if he agreed to forego his rights under the ADEA. These circumstances illustrate that Hallas's decision to sign the release was not the result of negotiation between him and his employer and, further, that Hallas was placed in precisely the "take it or leave it" predicament that supports a finding that his decision was not knowingly and willfully made.[12] These circumstances should have been considered by the district court in its determination of the validity of Hallas's waiver.

Also significant is the absence from the record of any indication that Hallas was encouraged by USS to consult an attorney prior to the execution of the release, or that Hallas did in fact consult with an attorney. We view this omission as particularly salient to this case in light of the

---

11. In fact, because of USS's subsequent decision to deny Hallas the 70/80 mutual option benefit, Hallas did not receive any compensation from USS until July, 1984 when he became eligible for the 70/80 "two-year break in service" pension.

12. Moreover, the choice that Hallas was given also supplies evidence that his decision to sign the contract was not free from duress. We have previously held that "a wrongful act or threat which prevented a party from exercising his free will and judgment" constitutes duress. *Plechner v. Widener College, Inc.*, 569 F.2d 1250 (3d Cir.1977). In the present case, USS's policy, which effectively deprived Hallas of severance benefits because he was "eligible" for the 70/80

option pension (contingent upon his execution of the ADEA waiver), *see* U.S. Steel's Severance Pay Program for Management Employees § 2.2 ("A participant otherwise eligible for severance pay shall not be eligible for severance pay if he is eligible for immediate pension under the Non–Contributory Pension Rules applicable to him"), placed unfair economic pressure upon him to sign the waiver to avoid having all of his income and benefits cease immediately. That policy was determined to contravene the ADEA in a separate case, *see EEOC v. Westinghouse*, and, in our view, was a "wrongful act" that could support a finding that Hallas executed the release under duress.

fact that the release that Hallas signed was determined to be *per se* violative of the ADEA in a separate proceeding. *See EEOC v. United States Steel*, 671 F.Supp. 351, 359 (W.D.Pa.1987). If Hallas had been advised by an attorney that the form had legal infirmities, perhaps he would have chosen to forego the 70/80 pension and pursue his claims under the ADEA. The record indicates that Hallas doubted the legal adequacy of the form. He testified that, after his second meeting with USS personnel supervisors regarding his pension, he returned to the EEOC and amended his complaint to include an allegation about USS's use of the PF–116–B form. Jt.App. at 94. He further testified that only after he had amended his complaint with the EEOC did he return to USS to sign the form. Because Hallas did not have guidance from an attorney, it is at least plausible that he believed that despite the language of the release, he had preserved his right to challenge the validity of the form by filing a timely complaint with the EEOC. On this point, we note that despite the language of the release and the fact that he had not begun to receive a pension, Hallas persisted in his decision not to withdraw his EEOC complaint. A meaningful comprehension of the legal significance of a release of ADEA claims, as well as the ability to understand the literal definitions of its terms, is necessary to a "knowing" waiver. On this record, the absence of assistance by an attorney makes the certainty that Hallas had that meaningful comprehension too doubtful for us to conclude that his waiver was knowingly executed.[13]

In our view, the record contains significant indicia that Hallas's decision to execute the waiver did not result from a volitional choice between real options, and that, for him, the absence of counsel resulted in a decision the legal significance of which he did not understand completely.[14] In light of these facts, we cannot conclude that Hallas's signature on the PF–116–B form reflected a knowing and willful waiver of his ADEA rights and we will, therefore, reverse the district court's finding to the contrary.

### III. CONCLUSION

For the foregoing reasons, we conclude that the district court erred in its decision denying Hallas leave to amend his complaint. Further, we conclude that the district court erred in its finding that Hallas's execution of USS's claim release form constituted a knowing and willful waiver of his rights pursuant to the ADEA.

Accordingly, we will vacate the district court's order denying leave to amend and remand for entry of an order consistent with this opinion and for further proceedings. We will also reverse the district court's finding that Hallas executed a valid waiver of his claims pursuant to the ADEA and remand for hearing on his claim of retaliation.

---

**13.** On this point, we take note that in judicial decisions that have examined factors relevant to the determination of the validity of the waiver of claims under the ADEA, the factor of whether the plaintiff had consulted an attorney prior to signing the agreement has been significant. *See Runyan*, 787 F.2d at 1044 (significant to the determination of the validity of the waiver was the fact that the plaintiff himself was "a well-paid, well-educated, labor lawyer with many years of experience in [the] area"); *E.E.O.C. v. American Express Publishing Corp.*, 681 F.Supp. at 220 (fact that lawyer was not present when plaintiff signed the agreement and did not have any role in the negotiation of the agreement,

despite fact that record indicated that plaintiff had consulted with a lawyer, was an issue of material fact that required adjudication prior to the determination of whether the plaintiff's release of his claims was valid).

**14.** Judge Hutchinson agrees that the district court's holding that Hallas signed the release voluntarily is clearly erroneous and that a totality of the circumstances approach to the issue of its validity is appropriate. On this record, however, he is unable to conclude that Hallas needed a lawyer to advise him on the release's possible effect on his ADEA retaliation claim.