Patricia **KRISTOFERSON** and Terry Lewis, Plaintiffs,

v.

**OTIS SPUNKMEYER, INC.,** Defendant.

**No. 96 Civil 2521 (JSR).**

United States District Court, S.D. New York.

June 3, 1997.

Richard B. Wolf, Poughkeepsie, NY, for Plaintiffs.

Mark Blondman, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

A terminated employee does not always go quietly. With increasing frequency, a former employee is apt to sue, alleging that the termination resulted from the employer's unlawful discrimination. Attempting to forestall such a lawsuit, an employer may offer additional termination benefits in return for a signed release from liability; but the circumstances under which the release is obtained may render it potentially voidable.

The question presented on the instant motion is whether, in such circumstances, the former employee must tender back to the employer the benefits that were received as consideration for the release before the employee can sue the employer for discriminatory termination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. For the reasons set forth below, the Court concludes that a proper accommodation of the relevant competing interests and policies is best achieved by requiring that such a plaintiff, as a requirement for commencing a Title VII action, enter into a binding undertaking to return to the employer, if the release is found invalid, the consideration for the release, in an amount and on a schedule and other terms to be set by the Court at the conclusion of the case, regardless of whether or not the plaintiff prevails on the Title VII claim.

By way of background, plaintiffs Patricia Kristoferson and Terry Lewis commenced this action in April, 1996, alleging that in early 1995 they were each wrongfully terminated by defendant Otis Spunkmeyer, Inc. on the basis of their gender, in violation of Title VII and various state statutes. Following discovery, Spunkmeyer moved for summary judgment on the grounds that at the time of their terminations the plaintiffs, in exchange for good consideration, had executed binding agreements releasing Spunkmeyer from any such liability, and further that the plaintiffs, by failing to tender back such consideration prior to commencing this action, had subsequently ratified the releases.

The record before the Court on summary judgment reveals the following facts (either undisputed or, where disputed, taken most favorably to plaintiffs) pertinent to this motion. On January 31, 1995, James Embry, Spunkmeyer's National Manager of Operations, met with Kristoferson for about 20 minutes at the restaurant of a local Ramada Inn, where, without advance notice, he informed her that she was being terminated and instructed her to sign "paperwork" that included a form agreement releasing Spunkmeyer from, among other things, the liability here in issue. Embry explained to Kristoferson that signing the release "means that you're not going to sue." He also told her that she needed to sign the release in order to receive her severance pay, and that by signing she would also receive accrued vacation pay and additional months of health insurance coverage extending beyond the termination date. Plaintiff then signed the release. *See* Kristoferson Dep. at 137–38.

Plaintiff Lewis was terminated on February 1, 1995, in a meeting with Embry at Bradley International Airport, Windsor Locks, Connecticut. As with plaintiff Kristoferson, she was presented with release papers and informed that she would need to sign them in order to receive severance pay, accrued vacation, and additional months of health insurance coverage. Plaintiff Lewis alleges, however, that she neither was told nor understood that the release would bar her from bringing this suit. *See* Lewis Dep. at 37–45.

 The manner and circumstances in which these releases were obtained reinforce the wisdom of the requirement in this Circuit that an employee's agreement to waive legal claims arising from violations of federal discrimination statutes must be made knowingly and voluntarily. *See Laniok v. Advisory Comm.*, 935 F.2d 1360, 1365 (2d Cir.1991). Such a determination can be made only upon examination of the "totality of the circumstances," including such factors as (1) the employee's education and business experience, (2) the clarity of the agreement, (3) the amount of time the employee had possession of or access to the agreement before signing

it, (4) the role of the employee in negotiating the terms of the agreement, (5) whether the employee consulted an attorney or, failing that, whether the employee had a fair opportunity to do so and whether the employer encouraged or discouraged the employee to do so, and (6) whether the consideration given exceeded employee benefits to which the employee was already entitled. *See Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 403 (2d Cir.1989).[1]

■ Applying these factors, Spunkmeyer itself concedes that material factual issues remain as to the initial validity of the release signed by Lewis, since that plaintiff alleges that she neither was told nor otherwise knew that the release would bar her from bringing this action. While Spunkmeyer contends that the situation is different with respect to plaintiff Kristoferson because of her acknowledgment that she was told that the release would bar her from bringing suit, the other relevant factors militate against finding as a matter of law that the waiver was voluntary. Taken by surprise, Kristoferson was able to examine the release for perhaps 15 minutes before signing it, without the opportunity to consult counsel; in other cases where such releases have been held valid, the employee had weeks or even months to make the determination. *See, e.g., Bormann*, 875 F.2d at 401; *Murphy v. IBM*, 810 F.Supp. 93, 95 (S.D.N.Y.1992); *Frumkin v. IBM*, 801 F.Supp. 1029, 1042 (S.D.N.Y.1992). Furthermore, it is far from clear that Kristoferson was accurately informed as to what portion of the benefits that she would receive in exchange for signing the release would be due her in any case and, conversely, what was the real consideration for the release. Nor was she presented with any meaningful opportunity to negotiate any of the terms of the form release. *See generally* T. Rakoff, "Contracts of Adhesion: An Essay in Reconstruction," 96 Harv. L.Rev. 1173 (1983). In-

stead, on Kristoferson's account of the meeting, everything was done to minimize her bargaining position and to maximize the pressures under which she had to "take it or leave it." Under these circumstances, there clearly remain disputed issues of material fact as to whether Kristoferson's execution of the release was genuinely knowing and voluntary.

■ Absent some specific statutory provision governing such releases, however, these alleged deficiencies in the manner in which they were obtained would, under ordinary principles of contract law, render them simply voidable rather than void. *see Fleming*, 27 F.3d at 261–62 (citing the absence of explicit federal regulation of releases in applying common law contract principles); *cf. Hogue v. Southern R.R. Co.*, 390 U.S. 516, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968) (applying federal regulation of releases under the Federal Employers' Liability Act, 45 U.S.C. § 55); *Oberg v. Allied Van Lines, Inc.*, 11 F.3d 679 (7th Cir.1993) (applying federal regulation of releases under the Jones Act, 46 U.S.C.App. § 688(a)); *Forbus v. Sears Roebuck & Co.*, 958 F.2d 1036 (11th Cir.1992) (applying federal regulation of releases under the Age Discrimination in Employment Act, 29 U.S.C. § 626(f)(1)). On this approach, a plaintiff, once apprised of her opportunity to void the bargain, could choose instead to keep the benefits and thereby "ratify" it. Taking this tack, Spunkmeyer argues that the plaintiffs here, by choosing to keep the extra benefits they obtained in return for the releases rather than tendering back such consideration prior to the commencement of this action, knowingly and voluntarily ratified the releases and are therefore barred from bringing this lawsuit.

While defendant supports this argument with references to the contract law of the states in which the releases were executed

---

**1.** Not all circuits agree with this approach. *Compare Coventry v. United States Steel Corp.*, 856 F.2d 514, 517 (3d Cir.1988) (applying a "totality of the circumstances" test); *O'Hare v. Global Natural Resources, Inc.*, 898 F.2d 1015, 1016 (5th Cir.1990) (same); *Pierce v. Atchison, Topeka and Santa Fe Railway Co.*, 65 F.3d 562, 571 (7th Cir.1995) (same); *with O'Shea v. Commercial Credit Corp.*, 930 F.2d 358, 362 (4th Cir.1991) (applying ordinary contract principles and rejecting a federal "totality of circumstances" test); *Runyan v. Nat'l Cash Register Corp.*, 787 F.2d 1039, 1044 n. 10 (6th Cir.) (en banc), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986) (same); *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 540 (8th Cir.), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987) (same).

548

(respectively, New York and Connecticut), two federal circuits have reached the same conclusion applying the federal common law of contract. *See Fleming v. United State Postal Service AMF O'Hare*, 27 F.3d 259, 261–62 (7th Cir.1994); *Wamsley v. Champlin Refining and Chemicals, Inc.*, 11 F.3d 534 (5th Cir.1993). Two other federal circuits, however, have suggested that overriding federal anti-discrimination policies render traditional principles of contract law (whether state or federal) inapplicable to this issue and negate any requirement of "tendering-back" as a condition of bringing an anti-discrimination lawsuit. *See Long v. Sears Roebuck & Co.*, 105 F.3d 1529 (3d Cir.1997); *Botefur v. City of Eagle Point*, 7 F.3d 152 (9th Cir. 1993). While these dueling lines of precedent from other circuits are helpful in framing the issue, this Court concludes that sensitive application of the concerns voiced by the Supreme Court and the Second Circuit in related areas leads to a result somewhat different from either of these approaches.

To begin with, it is clear to this Court from the Second Circuit's decision in *Bormann, supra*, that federal law must govern the question of whether and to what extent the doctrine of contractual ratification applies to agreements purporting to release an employer from Title VII liability, and, further, that traditional contractual principles, state or federal, must not be applied in this context in such a way as to undermine the legislative purpose to combat employment discrimination. Thus, in *Bormann*, the Second Circuit expressly rejected the application of "ordinary contract principles" to the determination of the facial validity of a release from discrimination liability, imposing instead a more rigorous and subjective "voluntariness" test in deference to the "strong Congressional purpose ... to eradicate discrimination in employment." *Bormann*, 875 F.2d at 403.

Fulfillment of the strong Congressional policy against employment discrimination is similarly relevant to the issue at bar. Although the concern over whether a release from liability is knowing and voluntary is very much lessened at the point of alleged ratification—since by definition ratification only occurs when a would-be plaintiff, now apprised that her prior agreement not to sue is voidable, chooses instead to retain the benefits of the agreement and thereby ratifies it—the practical problem is that a typical employee will already have spent the monies she received in exchange for the release by the time she learns of its voidability. *See Long*, 105 F.3d 1529, at 1542–43. While, unlike the retired employees in age discrimination lawsuits who might never be able to earn the wherewithal to return the consideration, a typical Title VII plaintiff might eventually be able to make such a recompense, in a great many cases it might require partial payments over time. Thus, as a practical matter, a strict application of a tender-back requirement would prevent many employees from whom releases had been coercively obtained from ever challenging the validity of the releases, in direct contravention of the basic teaching of *Bormann*.

On the other hand, no federal district court can ignore the wave of dubious and potentially extortionate discrimination cases currently flooding the federal docket. Undoubtedly part of the reason for this flood, which threatens to drown even valid anti-discrimination lawsuits in its wake, is the fact that current law enables such lawsuits to be brought at little or no economic risk to the plaintiffs, since such suits are typically brought on a contingent fee basis, with attorney fees recoverable by prevailing plaintiffs but not by prevailing defendants. *See* 42 U.S.C. § 1988. To enable a plaintiff who has already received substantial consideration for a release to keep that consideration while at the same time bringing the very lawsuit the release was intended to obviate is not only unfair on its face but is bound to encourage such doubtful litigation. Such an approach also undercuts what the Supreme Court has recognized is the "strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981).

Balancing these competing considerations, in the absence of more specific statutory guidance, *cf.* Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f), requires a federal court to take the same kinds of

initiatives as courts in equity have historically taken to lessen the rigors of the common law. In particular, equity's answer to the severe common law requirement of tendering-back was to permit an offer to tender-back, made coincident with the bringing of the action challenging the underlying contract, to substitute for the actual tender. *See Fleming*, 27 F.3d at 261, 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.15 (1990).

Elaborating and modifying that equitable approach in the instant context, this Court will henceforth require that, before a Title VII plaintiff who has previously received benefits for signing a release from such liability can go forward with such an action, the plaintiff must execute a formal undertaking that requires the plaintiff, if the release is later found to be invalid, to return the consideration to the employer, in an amount (including possible interest) and on a schedule and other terms to be determined by the Court at the conclusion of the case, regardless of whether the plaintiff thereafter prevails on her Title VII claim. The Court's theory in promulgating this approach is to place formerly-released plaintiffs at some potential economic risk if they choose to breach the facial terms of the release by bringing Title VII actions, while, on the other hand, not to impose an immediate price to the bringing of such a lawsuit that may prove prohibitive to legitimate victims of discrimination whose very economic circumstances may have contributed to their involuntarily executing a dubious release. In short, the object is to make sure that neither side gets a completely free ride on the expensive conveyance of legal process.

Since the plaintiffs in this case could not have necessarily foreseen this requirement, they will have 15 days in which to inform the Court whether they wish to execute such an undertaking, and, if so, to submit a proposed form thereof, after which defendant will have 15 days to submit any objection to the form. If no submission is received from plaintiffs by June 18, 1997, the Court will enter summary judgment for the defendant and dismiss the action (since the Court would not choose to exercise supplemental jurisdiction over the remaining state claims). Conversely, if after hearing from both sides an adequate undertaking is executed, the motion for summary judgement will be denied and a telephone conference of counsel will be convened for the purpose of setting a trial date for no later than September, 1997.

SO ORDERED.