**Francis H. TUNG, Plaintiff,**

**v.**

**TEXACO INCORPORATED, Defendant.**

**No. 97 CIV. 4118(CLB).**

United States District Court,
S.D. New York.

Sept. 11, 1997.

See also 150 F.3d 206.

Francis H. Tung, Wilton, CT, pro se.

Gary G. Cooper, Cooper & McMann, LLP, Elmsford, NY, for Texaco Incorporated.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

By motion heard July 31, 1997 and fully submitted for decision on September 8, 1997, Defendant moves for summary judgment, dismissing Plaintiff's Complaint.

Plaintiff, Francis H. Tung ("Tung"), who is a Chinese born American citizen, was employed by Defendant Texaco, Incorporated ("Texaco"), from December, 1980, until his termination on February 28, 1995, as a "Senior Operations Research Analyst" in the Information Technology Department ("ITD"). [Complaint at ¶¶ 9–10, 6/4/97]. Plaintiff worked in Texaco's headquarters in Harrison, New York.

Plaintiff was notified that he was terminated by the ITD Manager, Judith R. Mandile ("Mandile"), who told him that he was terminated,

> "for reason of company-wide expense cutting and reduction in force and because of his lower performance rating in relation to others in the department, and that his last day with Texaco would be April 30, 1995. There were no specific reasons given."

*Id.* at ¶ 10. At the time, Plaintiff was 56 years old and had been a Texaco employee for over 14 years.

Plaintiff received his Equal Employment Opportunity Commission ("EEOC") *Right to Sue* letter on March 7, 1997, after which he instituted this action.[1] However, the EEOC informed Plaintiff that while it gave him permission to sue, the EEOC "would not pursue his complaint, based on Texaco's reply that Tung was terminated because of his lower job performance rating in relation to others in the department." *Id.* at ¶ 13.

Tung asserts that Texaco's Performance Management Program ("PMP") "provides the basis for rating and relating pay increases and/or promotions to an employer's job performance," known in written form as a Performance and Development Review

("PDR"). *Id.* at ¶ 1. He claims that the PDR is written by an employee's immediate supervisor according to ratings determined through each category individually, plus an "overall" performance rating. While the PDR is instituted in order to aid employees in developing professionally, "there is no oversight from higher management and corporate human resources" to ensure its effectiveness. *Id.* The categories consist of:

> "accountability, accuracy, managing performance and development, communicating, initiative, leadership, planning, scheduling, customer satisfaction, human resources utilization, problem solving/decision making, productivity, resource utilization, safety, teamwork, and technical competence."

*Id.* at ¶ 2. Plaintiff claims that the PMP and PDR evaluation processes "are subjective, arbitrary, and inconsistent. Even the rating system used by the PMP process changes frequently, and employees therefore find themselves judged by a varying set of standards." *Id.* at ¶¶ 2–3.

Further, Plaintiff notes, the Office of Federal Contract Compliance Programs ("OFCCP") has reprimanded Texaco for its employment policies and practices, stating in a report that "minority groups had to wait far longer for promotions and were far less likely to receive evaluations that would help them in their careers" than others. *Id.* at ¶ 6. As a result, Texaco was ordered to revise its employee appraisal system, which it has not yet done. *Id.* at ¶ 7.

Plaintiff claims that he always performed "diligently and beyond satisfaction" in his 14 years at Texaco. *Id.* at ¶ 15. Plaintiff also states that he was at a "Grade 16" both at the time he began working at Texaco and when he was terminated, and that "no employee of Asian origin was above grade 16 in ITD out of a total of over 1,000 employees" at any time. *Id.* In fact, Plaintiff claims that he lost his supervisory status in ITD in 1992 *because* of a poor evaluation based on his national origin. *Id.* at ¶ 19. He claims that the Manager of ITD justified Plaintiff's low-

---

1. Although in his EEOC complaint Plaintiff claimed also that he was discriminated against

because of his gender, he makes no such claim in his Complaint to the Court.

est rating that year, a "G-" in communications and for "overall" performance, based on the facts that Plaintiff had a communications deficiency, was sometimes "difficult to understand" and "let things slide." *Id.*

In 1993, Texaco began reducing its work force. *Id.* at ¶ 20. Accordingly, Defendant lowered the retirement eligibility age from over 55 to 50 years old, and employees 50 years and older were asked to attend retirement seminars. *Id.* Plaintiff claims that he was pressured to retire under this new incentive and, because he did not, he was retaliated against by receiving another poor "G-" rating. *Id.* at ¶ 21. Before Plaintiff was terminated in 1995, he had never received any prior warning or admonition about his job performance. *Id.* at ¶ 24. Plaintiff alleges that he was terminated due to his 1994 "overall" PDR evaluation, in which he was rated a "G-." *Id.* at ¶ 22.

Plaintiff signed a "General Release" form upon leaving Texaco, electing to choose an option which would allow him to receive "Enhanced" benefits, which totalled two weeks base pay per year of continuous service, up to a maximum of 52 weeks. [Plaintiff's Affidavit in Opposition at 7/25/97]. However, Plaintiff claims that while he did sign the general Release and chose "Option B," he did so only because he believed that if he refused to, he "would have tipped the company to the possibility that I might sue it, prejudicing my entire chance for reemployment." *Id.* at 2. Accordingly, Plaintiff claims that his consent "was not truly voluntary." *Id.*

Defendant argues that Plaintiff's signing of the release bars all claims he might have had against Texaco, and that "he never intended to perform his obligations under the agreement, and that he knowingly induced Texaco to pay him additional consideration so as to deceive the Company as to his intent to sue it." [Defendant's Reply Memorandum in Support of its Motion at 1, 7/29/97]. Defendant contends, and this Court agrees, that because Plaintiff is barred, by his own agreement with Texaco, from filing the claims which he now asserts, Defendant's motion for summary judgment should be granted. [Defendant's Memorandum in Support of Motion at 2, 7/11/97].

In determining whether or not a waiver or release by a Plaintiff was knowingly and voluntarily given, factors considered include: (1) the Plaintiff's education and business experience; (2) the amount of time Plaintiff had possession of or access to the agreement before signing it; (3) the role of the Plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether the Plaintiff was represented by or consulted with an attorney; and (6) whether the consideration given, in exchange for the waiver of claims, exceeds employee benefits to which the employee was already entitled by law. *Bormann v. AT & T Communications, Inc.,* 875 F.2d 399, 403 (2d Cir.1989). It is not necessary that every factor be satisfied before a release can be enforced. *Laniok v. Advisory Committee of Brainerd Manufacturing Co. Pension Plan,* 935 F.2d 1360, 1368 (2d Cir.1991). Here, however, Defendant claims, and this Court agrees, that Plaintiff has satisfied all of these factors. [Defendant's Memorandum at 9].

*Factor 1:* Plaintiff's education and business experience is great, because he possesses two masters' degrees in business, and because he has been an employee for Texaco for 14 years in highly skilled positions, retiring as a "Senior Operations Research Analyst". *Id.* at 10.

*Factor 2:* The amount of time Plaintiff had possession of or access to the release before he signed it, similarly, leads the Court to conclude that he was given ample time—60 days (even though his release states "45 days"), to review and/or reject the proposed Release. *Id.*

*Factor 3:* The role of the Plaintiff in deciding his agreement terms: Plaintiff made no effort to negotiate the terms of the waiver, which he signed. *Id.* at 11. Even if Plaintiff had been denied such an opportunity, that alone is insufficient to require a trial on the issue of Plaintiff's voluntariness and the enforceability of the Release. As our Court of Appeals states in *Bormann v. AT & T Communications, Inc.,*

"A company's willingness to negotiate the terms of a waiver is, in part, additional evidence for the court that the employees

realized that they were giving up potentially valuable legal rights in exchange for consideration. In this case, other indicia, like the clarity of the waiver, make unmistakably clear that appellants were aware that they were giving up 'important rights.'"

875 F.2d 399 at n. 1.

*Factor 4:* The clarity of the waiver here is undisputable. Plaintiff signed the release, which unequivocally states that he releases Texaco:

"from all claims and/or causes of action, whether known or unknown to [Plaintiff] at this time, which [Plaintiff] may have or claim to have as of the effective date of this Release against [Texaco] in connection with [Plaintiff's] employment or separation from employment."

[*See* "Separation Pay Plan" Release, Exh. "A" to Mandile Affidavit]. As such, the terms of the Release present no triable issue.

*Factor 5:* Whether Plaintiff was represented by or consulted with an attorney: the Release states:

"I also acknowledge that I have been advised that I should consult with my personal legal, financial and tax advisors before signing this Release, and that I have had adequate time to do so."

["Separation Pay Plan" Release at ¶ 4, Exh. "A" to Mandile Affidavit]. Plaintiff also signed: "I voluntarily accept the Release as binding upon me." *Id.* Plaintiff had adequate time in which to consult with counsel and other professionals before signing the Release, the Release. He had the right to decide not to do so.

*Factor 6:* Does the consideration given in exchange for the relinquishment of all claims exceed that to which Plaintiff was already entitled by law. Clearly, by signing the Release, Plaintiff has agreed to accept benefit payments to which he would not have otherwise been entitled. Accordingly, Plaintiff has received the relief he has requested.[2] This Court has held that a Plaintiff who accepts and neither returns nor offers to return the consideration he or she has received for consideration for executing a release, is deemed to have ratified the Release and is thereby barred from challenging its validity. *Kristoferson v. Otis Spunkmeyer, Inc.,* 965 F.Supp. 545, 1997 WL 309938 (S.D.N.Y.1997); *Hodge v. New York College of Podiatric Medicine,* 940 F.Supp. 579, 584 (S.D.N.Y.1996). Plaintiff now informs us that if the Court is inclined to uphold the General Release, then Plaintiff is willing to repay Texaco the difference between Options A and B, "thus returning both parties to the positions each would have enjoyed had plaintiff initially refused to sign the General Release." *Id.* This is by no means an unconditional tender and occurs too late to undo the ratification resulting from acceptance and retention of the severance payments.

Finding that the claims sued on are barred by Release, the Court grants Defendant's summary judgment motion.

The Clerk shall enter final judgment.

SO ORDERED.

---

**2.** Plaintiff has received $46,497, in accordance with his signing the Release. Such payments were made between May 3, 1995 and November 1, 1995. [Affidavit of P. David Sherwin at 7/11/97].