**Barnett FRUMKIN, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

No. 91 Civ. 0756 (LMM).

United States District Court, S.D. New York.

July 1, 1992.

H.M. Weiner & Associates by Harold M. Weiner, New York City, for plaintiff.

Seward & Kissel by Dale C. Christensen, Jr., New York City, for defendant.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff Barnett Frumkin commenced this action in February 1991. The Complaint, filed on February 1, 1991, alleges violations of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (the "ADEA"), as well as New York State laws prohibiting fraud and negligent misrepresentation. Federal subject matter jurisdiction is founded on 28 U.S.C. § 1331 and principles of pendent (or "supplemental") jurisdiction. On April 30, 1991, Defendant International Business Machines (hereinafter "IBM") filed an Answer asserting both affirmative defenses to the allegations of the Complaint and a counterclaim for breach of a purported release signed by Plaintiff. Plaintiff filed no reply to the counterclaim.

This matter is now before the Court on Defendant's motion for summary judgment seeking dismissal of the Complaint and judgment in Defendant's favor on the counterclaim. Plaintiff cross-moves for an order striking the counterclaim for failure to state a cause of action or, in the alternative, allowing Plaintiff time to interpose a

reply. Plaintiff cross-moves further for leave to amend the Complaint to add a cause of action for constructive discharge, for an order compelling Defendant to comply with a request for documents, to recover the costs of this action, and for an order enlarging the time to complete discovery, which closed on November 22, 1991, pursuant to Court order.

For the reasons that follow, Defendant's motion addressed to the Complaint is granted, and the Complaint is dismissed on the alternative grounds (1) that the federal cause of action is time-barred and federal subject matter jurisdiction over the state law claims is lacking, or (2) that Plaintiff signed a valid waiver releasing Defendant from liability arising out of the employment relationship. Defendant's motion for summary judgment on the counterclaim is denied, and the counterclaim is dismissed for lack of federal subject matter jurisdiction. Plaintiff's cross-motion is denied in its entirety.[1]

*Disputed and Undisputed Facts*

Except as otherwise noted, the following recital of the factual background of this lawsuit is drawn from the allegations of the Complaint filed by Plaintiff in February 1991, and from Plaintiff's Statement pursuant to Local Rule 3(g) and Affidavits in Opposition to Defendant's motion.[2] Plaintiff was born on March 7, 1926, and was at all times relevant to the Complaint a person over forty years of age and thus a protected individual within the meaning of the ADEA. Plaintiff was initially employed by Defendant in 1955 and remained in Defendant's employ through the time of his retirement; by 1975, Plaintiff held a Masters Degree in Business Administration and by 1979 had achieved the position of second level manager in Defendant's "Facilities Planning and Requirements" department, with supervisory responsibility for three first level managers and approximately thirty employees who reported indirectly to him. Plaintiff retained the second manager's position and his supervisory duties until 1986, when a decision was made to reorganize the Department of Facilities Planning and Requirements; Plaintiff then became a member of the staff of the newly created "Headquarters Facilities Oversight Department." The Complaint alleges that in early 1988, Plaintiff applied for a position as Manager of IBM's North East regional office for the "Field Real Estate" organization but was advised by his immediate superior, Ruth Johnston–Hugret, that "the Defendant 'wanted a younger person' than plaintiff to fill the position." (Compl. ¶ 9.)

In the early spring of 1988, in connection with the announcement of another reorganization and the imminent relocation of Ms. Johnston–Hugret, Plaintiff expressed an interest in being considered for a position in the Travel Management Systems Department. Plaintiff alleges in affidavit testimony that in or around April 1988 he received and accepted an offer to become the Manager of Travel Management Systems, and that he "looked forward to the formal announcement and the challenge of a new position with a wider range of responsibilities" (Frumkin Aff. ¶ 14); the Complaint alleges more ambiguously that "Plaintiff indicated that he would be interested in accepting the position described." (Compl. ¶ 12.) In any event, the announcement of Plaintiff's relocation was made in August 1988, at which time Plaintiff was informed that his new title would be "Acting" Manager of Travel Management Systems. Some time shortly following the announcement, Plaintiff began work in his new capacity. Plaintiff's affidavit testimony characterizes his duties at Travel Management Systems as "largely routine"; Plaintiff alleges that as "Acting" Manager of the Department, he was prohibited by his new

---

1. Plaintiff's motion for an order compelling discovery was not filed until January 22, 1992—well after discovery was closed on November 22, 1991, pursuant to order of the Judge to whom this action was previously assigned—and for that reason is denied.

2. Certain non-material factual discrepancies appear in Plaintiff's documentary submissions; these the Court has attempted to harmonize where possible, construing ambiguities—in the context of Defendant's motion—in the light most favorable to Plaintiff, the non-moving party.

manager, Donald Gorr, from dealing directly with the two major travel agencies for which his department was responsible, and that "[t]his restraint was clearly a diminution of the authority and scope of the [Manager's] job" that had been held by his immediate predecessor. (Frumkin Aff. ¶¶ 17, 18.)

Although no mention of this occurrence appears in the Complaint, Defendant alleges—and Plaintiff does not dispute—that in August 1988 Plaintiff received from Donald Gorr a packet of materials outlining the provisions of IBM's "Financial Assistance Program" (the "FAP"), under which employees voluntarily retiring or resigning from the company could elect to receive, in exchange for signature of a release agreement waiving claims against Defendant, a special payment of up to two times their annual salary, plus transitional benefits and certain other benefits connected with career and outplacement assistance. (Def.'s Rule 3(g) Statement ¶¶ 14, 15.) That packet included a document characterized by Defendant as "a copy of the general release agreement [which] employees choosing to separate or retire under FAP were to sign," (Def.'s Rule 3(g) Statement ¶ 16), and an "interest form" to be signed by November 30, 1988. (Def.'s Rule 3(g) Statement ¶ 17.) With respect to the "general release," Plaintiff asserts that the document included in the packet he received from Donald Gorr in August 1988 was not captioned a "release," and that it differed in several significant respects from the release Plaintiff eventually signed on January 5, 1989. (Pl.'s Rule 3(g) Statement ¶¶ 2–3.) [3]

The position of Acting Manager, Travel Management Systems, was allegedly eliminated in October 1988, in connection with yet another reorganization at IBM, and Plaintiff was offered and accepted reassignment as Manager of the smaller, newly created Travel Measurement Analysis Department. Reassignment to Travel Measurement Analysis quickly became a source of much frustration and unhappiness to Plaintiff. According to the allegations of the Complaint, "[t]he new position and duties were substantially below plaintiff's managerial capabilities and former duty assignments.... Not only did the new managerial job offer plaintiff no real challenge or career path ... but the new position was two full salary levels below plaintiff's prior position." (Compl. ¶¶ 19, 20.) In affidavit testimony that is not entirely consistent with these allegations, Plaintiff asserts that no grade level was in fact ever assigned to his new position; rather, "Mr. Giue [Plaintiff's second line manager] told me that the grade level could be as much as two levels below my current status, but that my salary would not be decreased." (Frumkin Aff. ¶ 24.) Plaintiff alleges that the potential diminution of his salary grade threatened to place him above the top salary scale for the level assigned, which effectively would have precluded further salary raises, although it would not have resulted in any diminution of his pay. Within several weeks of undertaking his new responsibilities as Manager of the Travel Measurement Analysis Department, Plaintiff "knew [his] career at IBM was at an end." (Frumkin Aff. ¶ 34.) Plaintiff alleges that he was disappointed with his position, but he believed that IBM had done its best for him, and he "understood that sometimes these things happen in business." (Frumkin Aff. ¶ 35.)

Although he was receiving consistently excellent personnel evaluations during this difficult period, Plaintiff reluctantly began to consider the possibility of employment outside of IBM. In October 1988, wishing to keep open his option to accept early retirement in exchange for certain financial incentives, Plaintiff signed the FAP interest form previously described. Defendant alleges—and Plaintiff does not appear to deny—that the interest form included language to the effect that acceptance of the

---

**3.** For purposes of deciding Defendant's motion addressed to the Complaint, the Court attaches no evidentiary significance to Plaintiff's affirmative response, in deposition testimony, to Defendant's question as follows:

Q: But isn't it a fact ... that you had a copy of the form of this release as early as August of 1988?
A: I believe it is.
(Frumkin Dep. at 120.)

FAP was voluntary and that employees could withdraw from consideration for the program at any time prior to leaving the company. The interest form also included an acknowledgement that acceptance of the FAP payment would be in lieu of any normal separation pay to which an employee might otherwise be entitled, would be available only to eligible employees, and would be made in exchange for the execution of a release and "acknowledge[ment] [of] several conditions associated with [the] resignation/retirement under this program." (Def.'s Rule 3(g) Statement ¶ 19.)

Plaintiff found potential new employment outside of IBM in November 1988 and informed Donald Gorr that he would be accepting the FAP and beginning a new job in December. It was agreed between Plaintiff and Gorr that Plaintiff would remain on the IBM payroll through the month of December 1988, and would formally accept the FAP and early retirement beginning in January 1989. Defendant alleges, and Plaintiff does not dispute, that on January 5, 1989, in the presence of Donald Gorr, Plaintiff read and signed a one-page document purporting to release Defendant, its employees and agents from any claims arising out of Plaintiff's employment at IBM, and acknowledging receipt of a "lump-sum financial assistance payment" of $178,001.40. It is undisputed that Plaintiff received, and has retained, that sum of money.

The Complaint alleges that sometime in or around February 1989, following his departure from IBM, plaintiff became aware for the first time that the Travel Management Systems Department had been "re-established," and that the position held by Plaintiff "prior to demotion" had been filled by a "substantially younger man with many years less in the employ of Defendant, at a much lower salary than [Plaintiff] had been paid in the position." (Compl. ¶ 29.)

In mid-April 1989, Plaintiff filed with the Equal Employment Opportunity Commission (the "EEOC") a charge of discrimination in employment in violation of the ADEA. On February 27, 1990, the EEOC issued a reviewable determination concluding that "the evidence obtained during the investigation does not establish a violation of the statute," and advising that absent the submission, on or before March 14, 1990, of a request for review, that determination would become final on March 15, 1990, and the charge would be dismissed. The final paragraph of the EEOC determination advises that "[i]f the Charging Party wishes to pursue his claim in court under the ADEA, the lawsuit must be brought within two years of the alleged discriminatory act[,] October 1, 1988[,] or within three years in cases of willful violation(s)." (Christensen Aff., Ex. "A".)

As previously noted, Plaintiff commenced this action by the filing of a Complaint in the Southern District of New York on February 1, 1991. The gravamen of Plaintiff's claim under the ADEA is that Defendant's decision to eliminate Travel Management Systems and plaintiff's position as Acting Manager of that department was not made in good faith but was, rather, "a ploy to induce [P]laintiff to retire" so that he could be replaced by a younger employee at a lower salary. (Compl. ¶¶ 25, 26.) Plaintiff alleges that he would not have accepted the FAP had he known or had reason to believe that his former job and functions in the Travel Management Systems Department had not been abolished, and he asserts that Defendant, through its agents, officers, and personnel managers, was well aware of his reluctance to retire and knew that he would have been eager to resume his duties, but did not inform him of the re-creation of the department. Plaintiff alleges that the explanation offered by Defendant for the re-establishment of the Department and the position—i.e. Donald Gorr's unforeseen physical inability to perform the functions previously assigned to Plaintiff and redistributed to Gorr in connection with the October reorganization—is merely a pretext for discriminatory motive. According to the allegations of the Complaint, "Defendant's actions, and inactions when it had an affirmative duty to act, constitute a violation of the provisions of the [ADEA]," (Compl. ¶ 35), and by virtue of such violation Plain-

tiff has suffered, and continues to suffer, "economic damage, mental anguish and hardship, in excess of the sum of $750,-000.00," including, *inter alia,* past and future compensation, lost life insurance and disability benefits, lost pension and 401(k) plan benefits, expenses of seeking other employment, and counsel fees and expenses of the instant action. (Compl. ¶ 36.)

*Defendant's Motion Addressed to the Complaint*

Time Bar

The limitations period for a cause of action brought pursuant to the ADEA is set forth in Section 7(e) of the Act, 29 U.S.C. § 626(e), incorporating the statute of limitations provisions of the Portal–to–Portal Act, 29 U.S.C. § 255(a), under which an action "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued...." Reasoning— apparently on the basis of the October 1988 reorganization at IBM and the EEOC Determination previously cited herein—that any cause of action for age discrimination would have accrued on the first day of October, 1988, Defendant alleges that Plaintiff's federal claim was already time-barred when it was commenced on February 1, 1991, more than two years after the statutory period began to run. In opposition to Defendant's statute of limitations argument, Plaintiff asserts that the limitations period applicable to his federal claim is the longer three year period available for willful violations of the ADEA; in any event, Plaintiff argues, the ADEA cause of action accrued not in October of 1988, but rather in February of 1989, the month in which Plaintiff first learned of his replacement in the Travel Management Systems Department, and "the first opportunity [Plaintiff] had to know that he had been defrauded out of his career because of his age." (Pl.'s Mem. in Opp'n at 7.)

When Did the Cause of Action Accrue?

██ ██ The analysis of Plaintiff's federal age discrimination claim for statute of limitations purposes must begin with a description of the conduct, purportedly proscribed by the ADEA, of which Plaintiff complains. Although the Complaint does not particularize those sections of the Act in violation of which Defendant is alleged to have acted or neglected a duty to act, Plaintiff appears to intend an allegation that his retirement pursuant to the terms of the FAP was coerced in violation of the general proscriptions of 29 U.S.C. § 623(a), which provides:

> It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; ...

Paragraphs 25 through 28 of the Complaint, insofar as they allege that Defendant's decision to eliminate Plaintiff's position was undertaken in a bad faith effort to induce Plaintiff's retirement and replace him with a younger employee, may fairly be read to intend an allegation that Defendant's activities in procuring that retirement were not entitled to immunity from the proscriptions of the statute under Section 4(f)(2) of the Act, which provided—at the time relevant to this action—as follows:

> It shall not be unlawful for an employer
>
> .    .    .    .    .
>
> (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that ... no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual; ...

29 U.S.C. § 623(f)(2) (1985).[4]

As previously set forth, Plaintiff alleges that the reorganization of the Travel Man-

---

**4.** Section 4(f)(2) was amended by Congress. *See* Pub.L. 101–433, § 103(1), 104 Stat. 978, 979 (October 16, 1990) (as amended by Pub.L. No. 101–521, 104 Stat. 2287 (November 5, 1990)). But the amendment has only prospective effect, and applies to employee benefits established or

agement Systems Department and the elimination of his position took place in October 1988 and that he reluctantly accepted reassignment at that time. The discrimination alleged is Defendant's purported scam in undertaking temporarily to "reorganize" or "eliminate" the Travel Management Systems Department—and Plaintiff's position therein—so that both could be re-established at a later date, following Plaintiff's retirement from the company: a plain reading of the Complaint suggests that the purported "ploy to induce [P]laintiff to retire" went into operation no later than October 1988, when Plaintiff's position was eliminated and Plaintiff was reassigned. On this record, it appears clear that any violation by Defendant of Section 4(a) of the ADEA, 29 U.S.C. § 623(a), must have occurred—and Plaintiff's cause of action must have accrued—in or around October 1988, at the time when Defendant allegedly undertook in bad faith to induce Plaintiff's retirement, and not in February 1989, at the moment some four months later when the chain of events following his departure from the company first came to Plaintiff's attention.

The Court's conclusion that Plaintiff's cause of action accrued, for statute of limitations purposes, no later than October 1988 is altered neither by Plaintiff's actual continuation at IBM through November 1988, nor by Defendant's failure to rehire Plaintiff following the "re-creation" of his position in the Travel Management Systems Department sometime in early 1989.[5] Plaintiff's averred belief that "as a matter of IBM policy, if a job opened for him, he would be rehired for it," (Pl.'s Mem. in Opp'n at 19), expresses hope, not founded expectation, and the hypothetical language contained in the release and cited by Plaintiff, (Pl.'s Mem. in Opp'n at 19), creates no obligation on the part of IBM.

Because there is a "reasonable ascertainable date on which the act ... occurred,

that is the day on which the statute began to run," notwithstanding that plaintiff may still feel some effects as a result of the prior discriminatory act.... Put somewhat differently, "a plaintiff may not circumvent the limitations period merely by labelling an act a 'continuing' violation."

*Malarkey v. Texaco, Inc.*, 559 F.Supp. 117, 121 (S.D.N.Y.1982) (citing *Marshall v. American Motors Corp.*, 475 F.Supp. 875 (E.D.Mich.1979); *Corbin v. Pan American World Airways*, 432 F.Supp. 939, 944 (N.D.Cal.1977)), *aff'd*, 704 F.2d 674 (2d Cir. 1983). Notwithstanding his assertion that the date of a phone call he received in February of 1989 represented the first occasion on which he "knew, or should have known, that he was part of an anti-age bias that had been institutionalized at IBM," (Pl.'s Mem. at 6), Plaintiff's papers contain no allegation that information about the purported re-creation of the Travel Management Systems Department had been kept from him, and the record contains no evidence that he was "actively misled," unable reasonably to discover the alleged discrimination against him, or prevented in any manner from exercising his rights. *Cerbone v. I.L.G.W.U.*, 768 F.2d 45, 49 (2d Cir.1985); *see also Seedman v. Alexander's Inc.*, 683 F.Supp. 924, 926 (S.D.N.Y. 1987) (commencement of period for filing may be equitably tolled where employee's unawareness of cause of action was due to employer's misleading conduct). In circumstances such as these, no ends of justice or fairness would be served by equitable tolling of the statutory period until such time as Plaintiff asserts he first became aware of the discrimination alleged to underlie his federal cause of action.

### Was the Action Timely Commenced?

Plaintiff's federal cause of action for age discrimination having accrued in October

---

modified on or after October 16, 1990. Pub.L. No. 101–433, § 105, 104 Stat. 978, 981. In the instant case, neither party has alleged that the FAP was modified on or after October 16, 1990.

**·5.** In any event, accrual of Plaintiff's cause of action at any time before February 1, 1989,

would not change the analysis for statute of limitations purposes since any such cause of action would still be time-barred under the two year limitations period but timely under the three year period.

1988, the timeliness of the suit commenced on February 1, 1991—more than two but less than three years after the statute of limitations began to run—turns on the "willfulness" of the purported ADEA violation. Construing the statutory language in the context of the liquidated damages provision of the ADEA, the Supreme Court has held that an employer's conduct is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128, 105 S.Ct. 613, 625, 83 L.Ed.2d 523 (1985). The question left open in *Thurston*, whether the word "willful" has the same meaning for liquidated damages and statute of limitations purposes, has been answered affirmatively in this Circuit. *Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 45 (2d Cir.1988).

In support of the motion to dismiss the Complaint as time-barred, Defendant argues that Plaintiff has not alleged and could not prove a willful violation of the ADEA. In Defendant's view, the averments contained in the Complaint amount at very most to allegations that the Defendant intended to and did in fact induce Plaintiff's early retirement, and Plaintiff has adduced no evidence giving rise to an inference of willful violation of the statute.

■ It is of course beyond dispute that the Complaint includes no specific allegation that the Defendant acted in knowing violation of the ADEA or demonstrated "reckless disregard" for the applicability to its conduct of the proscriptions set forth in that statute. The Complaint's only unambiguous reference to a "willful" violation of the ADEA is to be found in the final paragraph, in which appears Plaintiff's prayer for relief, including, *inter alia*, "$750,000.00 in added exemplary damages for wilfully violating the [ADEA] and [Plaintiff's] rights arising under it." As a matter of pleading, this does not render the Complaint defective since Plaintiff's obligation to articulate "a short and plain statement of the claim showing that [he] is entitled to relief," Fed.R.Civ.P. 8(a)(2), entails no requirement that he employ the phrase "willful violation" or that he replicate in the Complaint the language formulated by the courts in construing that phrase as it is used in the ADEA. For pleading purposes, therefor, the Court finds that the allegations contained in Paragraphs 25 through 27—including averments that "Defendant's decision to eliminat[e] ... the Travel Management Systems department and [P]laintiff's position ... was not done in good faith," that "[D]efendant's actions were ... a ploy to induce plaintiff to retire far sooner than he had planned [because] ... [D]efendant intended to replace him in his job functions with a much younger employee," and that "[b]ecause of Defendant's actions ... [P]laintiff was coaxed to elect a financial incentive program created to induce professionals like himself to retire early from the Defendant's employment"—state a claim for willful violation of the ADEA that would be sufficient to withstand a motion to dismiss based on Fed.R.Civ.P. 12.

The sufficiency of Plaintiff's case in opposition to a motion for summary judgment on statute of limitations grounds presents a more complicated issue. In the summary judgment context, the Court must determine whether the allegation that there occurred a willful violation of the ADEA should be placed before a finder of fact or decided by the Court as a matter of law; alternatively put, the question is "whether, considering all of the evidence in a light most favorable to the plaintiff, a rational trier of fact could find that [IBM] engaged in age discrimination *and* knew or showed reckless disregard for whether its conduct violated the ADEA," *Russo*, 837 F.2d at 45 (emphasis added), whether, that is, Plaintiff has alleged, and adduced facts tending to demonstrate, "not only deliberate age discrimination but also an appreciation of its illegality and a resultant attempt to conceal it." *Id.*

In *Russo*—a case which, like the action currently before the Court, involved a claim whose timeliness turned on the willfulness of the ADEA violation alleged—the Second Circuit addressed the threshold statute of limitations issue by delving in

the first instance into the sufficiency of the plaintiff's evidentiary submission. "Because there cannot be willfulness absent a violation of the ADEA," the *Russo* Court reasoned, "our analysis must begin with the issue of whether [the plaintiff] made an evidentiary submission sufficient to survive a motion for summary judgment on the issue of age discrimination." *Russo*, 837 F.2d at 43. The familiar standards relating to burden and order of proof in Title VII and ADEA cases, reiterated by the Second Circuit in *Russo* and applied to the facts of that appeal, led the Circuit to the conclusion that Russo had established his *prima facie* case of wrongful termination there: Russo had demonstrated that he belonged to the age group protected under the statute, that he was qualified for his position, and that he had been discharged under circumstances that gave rise to an inference of discrimination. Because a trier of fact might reasonably find that the employer's articulated legitimate reason for issuing the "transfer or terminate" order that resulted in Russo's discharge was in fact a pretext for prohibited discrimination, the Court determined, Russo had also met his secondary burden of production under the burden-shifting standard of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (applicable to ADEA cases under *Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir.1983)), and had adduced sufficient evidence to withstand the motion for summary judgment on the merits of his age discrimination claim. Turning finally to the issue of willfulness, the *Russo* Court examined the record and determined that Russo's case on that issue too, although not strong, was adequate to survive the motion for summary judgment on time-bar grounds.

In the present case, Defendant argues that Plaintiff cannot make his *prima facie* showing because, among other things, "[P]laintiff was indisputably not discharged [but rather] voluntarily elected to retire...." (Def.'s Mem. at 27.) Of course, Plaintiff's failure to allege that he was actively terminated by Defendant is immaterial in the context of the ADEA claim he asserts—namely, that his retire-

ment was effectively coerced in violation of the statute. Both parties' failure to discuss the elements of a *prima facie* case, and the mechanics of burden-shifting, specifically in the context of a claim such as the Plaintiff's here is regrettable in light of the interesting history of Section 4(f) of the ADEA and the somewhat cumbersome nature of the Court's task in evaluating the summary judgment motion based on a statute of limitations defense after *Russo*.

Before the announcement of the Supreme Court's decision in *Public Employees Retirement System of Ohio v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), the Second Circuit had joined several of its sister courts in holding that the exceptions to the general proscriptions of the ADEA set forth in Section 4(f)(2) of that statute, 29 U.S.C. § 623(f)(2), constituted an affirmative defense to a charge of discrimination under the Act, and that in any age discrimination action based on allegations involving a retirement plan, "the employer [had] the burden of proving that its age-based actions [fell] within the exception provided...." *EEOC v. Home Insurance Co.*, 672 F.2d 252, 257 (2d Cir.1982).

In *Betts* the Supreme Court undertook to clarify the nature of the exemption provided in Section 4(f)(2) and in so doing to elucidate the elements of a *prima facie* case of age discrimination involving a retirement plan. Construing the language of the ADEA to reflect Congressional intent to "[leave] the employee benefit battle for another day, and legislate[ ] only as to hiring and firing, wages and salaries, and other nonfringe-benefit terms and conditions of employment," *Betts*, 492 U.S. at 177, 109 S.Ct. at 2866, the Court read Section 4(f)(2) as exempting from the prohibitions of the statute those bona fide benefit plans that do not, in fact, amount to "method[s] of discriminating in other, nonfringe-benefit aspects of the employment relationship." *Id.* "By requiring a showing of actual intent to discriminate in those aspects of the employment relationship protected by the provisions of the ADEA," the Court wrote,

**1038**

§ 4(f)(2) redefines the elements of a plaintiff's prima facie case instead of establishing a defense to what otherwise would be a violation of the Act. Thus, when an employee seeks to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some nonfringe-benefit aspect of the employment relation.

*Id.* at 181, 109 S.Ct. at 2868.

■ Before *Betts* it might well have appeared that a plaintiff could make out a *prima facie* case of age discrimination by alleging simply that he was in the protected class and retired pursuant to a retirement plan.[6] After *Betts*,[7] it appears clear that a plaintiff such as Plaintiff here must at least allege in the first instance that he (1) falls within the protected class (2) was qualified for the position he held and (3) retired pursuant to a retirement plan under circumstances giving rise to an inference that that plan in fact amounted to a "subterfuge to evade the purposes of [the ADEA]," or that it "require[d] or permit[ted] [his] involuntary retirement ... because of [his] age." 29 U.S.C. § 623(f)(2) (1985). *See Gabarczyk v. Board of Education*, 738 F.Supp. 118, 122 (S.D.N.Y. 1990).

■ The plaintiff's *prima facie* showing once established, "[a]n employer may not remain silent ... but must come forward with a 'clear and reasonably specific' explanation of its [allegedly discriminatory] decision." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991). "Nevertheless, 'the burden of *persuasion* does *not* shift to the employer to show that its stated legitimate reason for the employment decision was the true reason.'" *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 245, 109 S.Ct. 1775, 1788, 104

L.Ed.2d 268 (1989) (footnote omitted)). Where an employer such as Defendant here adduces clear and specific evidence tending reasonably to dispel the inference of subterfuge, the burden must revert to Plaintiff—who of course sustains the ultimate burden of proving his discrimination case—to rebut the employer's explanation with some evidence from which a finder of fact could conclude that the employer's reliance on the statutory exemption is unjustified, and his claim that the retirement plan was not a subterfuge for prohibited discrimination is pretextual and unworthy of belief. So construing the requirements of the ADEA and the nature of the plaintiff's *prima facie* case of discrimination in a retirement plan context thereunder, the Court turns to the record on the motion for summary judgment.

■ As previously noted, Defendant contends that Plaintiff cannot sustain his *prima facie* burden because the evidence demonstrates unambiguously that Plaintiff's retirement was voluntary, and because Plaintiff raises no genuine issue of material fact giving rise to an inference of age discrimination. In opposition to the motion, Plaintiff points to several factual allegations on the basis of which, in his view, a finder of fact could both infer age discrimination in the first instance, and conclude in the second that the "restructuring" which resulted in Plaintiff's reassignment and eventual retirement was in fact a pretext for Defendant's willful violation of the ADEA:

> Given that the T[ravel] M[anagement] S[ystems] [D]epartment was disbanded prior to Mr. Frumkin's retirement and then reestablished just six weeks after that time, a trier of fact could quite easily find IBM's "restructuring" to be a mere pretext for willful discrimination. The creation of the two person [T]ravel

---

**6.** Indeed, the Second Circuit did once so hold in the context of a voluntary early retirement plan that targeted workers over sixty years of age. The opinion, *Paolillo v. Dresser Industries, Inc.*, was reported at 813 F.2d 583 and subsequently withdrawn. The substituted opinion, located at 821 F.2d 81 (2d Cir.1987), omits the earlier

opinion's discussion of burdens of proof and the elements of a plaintiff's *prima facie* case in the retirement plan context.

**7.** At least with respect to any cause of action that, like the instant suit, is unaffected by the amendment of Section 4(f)(2).

[M]easurements department to be managed by Plaintiff completely contradicted IBM's stated restructuring goals: the expansion of authority by each manager, and the formation of fewer but larger departments. In addition, IBM replaced Mr. Frumkin with a much younger man after reestablishing his original department, and made no attempt to offer him the position, despite his outstanding qualifications and performance evaluations. (Pl's. Mem. in Opp'n at 17–18.)

Resolving all ambiguities in Plaintiff's favor, as of course, in the context of Defendant's motion for summary judgment, it is constrained to do, *see Binder*, 933 F.2d at 191, the Court assumes the truth of Plaintiff's allegation that he believed the Travel Management Systems Department to have been eliminated, and its functions effectively abandoned, pursuant to the reorganization that took place in October 1988.[8] Plaintiff's suggestion that the Department was re-created in mid-February 1989, a mere six weeks after his retirement, and that that fact gives rise to an inference of prohibited discrimination, is another matter: the undisputed evidence in the record establishes that Plaintiff accepted reassignment from Travel Management Systems to Travel Measurement Analysis in October 1988, planned to cease working for the company in any capacity in early December 1988, and was removed from Defendant's payroll effective December 31, 1988. The re-establishment of the Travel Management Systems Department upon which Plaintiff relies took place, then, over four *months* after Plaintiff moved (or was removed) from his position as the acting manager in early October, and over two months after he apparently ceased actually to work for IBM.

Similarly insufficient to create or support an inference of age discrimination is Plaintiff's assertion that the establishment of the smaller Travel Measurement Analysis Department was inconsistent with Defendant's stated reorganizational goal of creating fewer but larger departments, with greater responsibility distributed among a smaller number of managers. It is of course axiomatic that " '[t]he [ADEA] does not authorize the courts to judge the wisdom of a corporation's business decisions,' " *Maresco v. Evans Chemetics*, 964 F.2d 106, 112 (2d Cir.1992) (quoting *Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 725, 74 L.Ed.2d 950 (1983)), and although the Court "is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith," *Montana v. First Federal Savings & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir.1989), neither is it obligated to dismiss as unworthy of belief a credible explanation of a business judgment. Defendant's decision to consolidate the management structure of the Travel Management Systems Department, assigning "first-line management responsibility" for the Travel Management staff to Plaintiff's superior, Donald Gorr, in fact appears consistent with the company's articulated organizational goals; the decision to carve out of Mr. Gorr's direct control a separate structural entity (Travel Measurement Analysis) under Plaintiff's authority supports, if anything, an inference that Defendant hoped and expected to maintain Plaintiff in a managerial capacity despite the consolidation of the Travel Management Systems Department.

Finally, no inference of discrimination arises on this record from Defendant's decision to re-establish Travel Management

---

**8.** Plaintiff's allegation that he was fraudulently led to understand that the Department had been abolished when in fact it had not is somewhat difficult to reconcile with his assertion that Defendant "re-established" or "re-created" the Travel Management Systems Department in early 1989, following Plaintiff's retirement. The Court assumes Plaintiff to intend an allegation that he was told Travel Management Systems would be eliminated and its functions either abandoned or consolidated with those of other departments, that he believed Travel Management in fact to have been permanently eliminated, and that he construes the department's reestablishment in early 1989 to evidence Defendant's bad faith in inducing his belief that his position would cease to exist after October 1988. In the context of Defendant's summary judgment motion, the Court further assumes the truth of Plaintiff's disputed factual assertion that he was told the Travel Management Systems Department would be eliminated.

Systems in February 1989 or from the employment of a man eighteen years Plaintiff's junior as the Manager of that department. Defendant plausibly alleges that Donald Gorr was diagnosed with cancer in mid-October 1988 (apparently following the announcement of the reorganization and the expansion of his area of control), that he underwent surgery in early November 1988, and that he returned to work in mid-December of that year, hoping and intending to reassume his full responsibilities. Defendant alleges—and Plaintiff does not appear to dispute—that Mr. Gorr became convinced in early 1989 that he would not be able to maintain his schedule and discharge his expanded obligations. A decision was made at that point not to replace Plaintiff as Manager of Travel Measurement Analysis, but rather to reconsolidate that function with the functions then being performed by Mr. Gorr, to re-establish Travel Management Systems as a distinct structural entity, and to hire one person who would manage the Department under Gorr's supervision. Plaintiff offers no factual support whatever for his allegation that this explanation is pretextual and the re-establishment of Travel Management Systems a cover for prohibited discrimination; he points only to the fact that Mr. Halley, the individual selected for the re-created Manager's position at Travel Management Systems, is many years his junior [9] and assertedly has less experience at IBM. Plaintiff cites no authority to support the proposition either that an inference of discrimination follows simply from the fact that Defendant hired a younger man to perform the functions at one time assigned to Plaintiff, or that such an inference is created by Defendant's business decision not to offer to rehire Plaintiff following his separation from the company. Defendant was of course under no obligation to rehire Plaintiff, and no representation to the contrary appears in the language of the release, or indeed any other document, cited by Plaintiff.

On this record, the Court concludes that plaintiff has not carried his burden in opposition to the motion for summary judgment on the merits of his cause of action and—having failed to demonstrate the existence of a material, genuinely disputed factual issue on the substance of the discrimination claim—cannot be said to have adduced sufficient evidence of willful violation to entitle him to put his case for the extended three year statute of limitations before a finder of fact. Although undisputedly within the protected age group and well qualified for his job, Plaintiff adduces only minimal evidence possibly giving rise to an inference that the reorganization which resulted in the elimination of his position in October 1988 was in reality a ploy to induce his retirement, and no facts tending to cast doubt upon the credibility of Defendant's stated reason for the "re-establishment" of that position following Plaintiff's departure.[10] Plaintiff's cause of action for age

9. In fact, John Halley, who is characterized—accurately but somewhat disingenuously—in the Complaint as a person "substantially younger" than Plaintiff and—less accurately—in Plaintiff's Memorandum as a "young man in his early forties," (Pl's. Mem. at 7), was forty-four at the time of his hiring and thus, like Plaintiff, a protected individual within the meaning of the ADEA.

10. The Court finds that no inference of discrimination arises from the comment alleged to have been made to Plaintiff by Ms. Johnston–Hugret, early in 1988, in connection with Plaintiff's application (unrelated to the reorganization that is the subject of the instant suit) for the position in the North East regional office. Plaintiff's Memorandum makes no reference to this comment, and although an allegation concerning the remark does appear in the Complaint, it is unclear what weight Plaintiff would have the Court assign it. The Court's conclusion that the comment does not give rise to an inference of prohibited discrimination in the context of the instant suit is bolstered by Plaintiff's deposition testimony to the effect that he does not remember the specifics of his conversation with Ms. Johnston–Hugret, (Frumkin Dep. at 64–65), and is not certain who she told him was the source of the information. (Frumkin Dep. at 67.) It is bolstered further by the fact that Plaintiff has testified that he recalls having witnessed no acts of discrimination by Defendant during his employment as a manager at IBM, (Frumkin Dep. at 36), believed that it was IBM's policy not to engage in discriminatory practices, (Frumkin Dep. at 30, 35), and—notwithstanding the conversation with Ms. Johnston–Hugret—did not believe that he himself had been the victim of any discrimination by Defendant until sometime in February 1989. (Frumkin Aff. ¶¶ 40, 45, 59, 60.)

discrimination having accrued in October 1988, and Plaintiff having failed to adduce evidence of a willful violation of the ADEA sufficient to withstand Defendant's motion for summary judgment on that issue, the Court finds that Plaintiff's federal cause of action is time-barred, and must be dismissed. Accordingly, Plaintiff's non-federal claims for fraud and negligent misrepresentation are also dismissed, pursuant to 28 U.S.C. § 1367(c)(3) (Supp.1991) (effective Dec. 1, 1990).

*Alternative Grounds for Dismissal of the Complaint*

■ Even if his federal cause of action were not time-barred, the entirety of Plaintiff's action would have to be dismissed on grounds that Plaintiff signed a valid release in January 1989 and did not effectively repudiate it at any time thereafter. An individual is entitled to settle or waive claims arising out of violations of the ADEA, provided that the waiver is made knowingly and voluntarily.[11] *See Laniok v. Advisory Committee*, 935 F.2d 1360, 1365 (2d Cir.1991). In *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399 (2d Cir.1989), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989), the Second Circuit adopted a "totality of the circumstances" analysis for determining the voluntariness of a waiver. That approach was based on discussion in *Coventry v. United States Steel Corp.*, 856 F.2d 514 (3d Cir.1988), in which the Third Circuit looked to such factors as:

1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Id.* at 523 (quoting *E.E.O.C. v. American Express Publishing Corp.*, 681 F.Supp. 216, 219 (S.D.N.Y.1988)). To this non-exhaustive list the *Bormann* Court added one other matter for consideration: "whether an employer encourages or discourages an employee to consult an attorney, and whether the employee had a fair opportunity to do so." *Bormann*, 875 F.2d at 403 (citation omitted).

Plaintiff argues vigorously that the release he signed on January 5, 1989, was not knowingly and voluntarily executed within the meaning of *Bormann* and cannot, therefore, be held to preclude his action here. As a preliminary matter, Plaintiff asserts that his signature on the release was fraudulently induced insofar as he "had no idea he was being discriminated against the day he signed the Release [and] ... had been fraudulently told ... that the department for which he worked ... was being abolished." (Pl's. Mem. at 18.) Plaintiff alleges further that he is neither an attorney nor a person educated in legal matters and he did not consult with counsel before signing the release; he points out that he did not negotiate the terms of the document before executing it, and was not encouraged by Defendant to seek independent advice. Turning to the other factors set forth in *Bormann*, Plaintiff contends that the release he signed in January 1989 differed in several significant respects from the one he had received for his consideration in August 1988, and that the financial incentive he received upon signature of the FAP forms was not consideration for the purported release but rather severance pay "premised on the possibility of [Plaintiff's] return to the company." (Pl's. Mem. at 19.) Finally, Plaintiff asserts that the acts of discrimination that form the basis of his suit occurred after execution of the release, that it was not his intention prospectively to release Defendant from liability for such claims, and that he effectively repudiated the document signed on January 5, 1989, first by filing a complaint

---

11. Pub.L. No. 101–433, § 201, 104 Stat. 983, which amends 29 U.S.C. § 626(f) by specifying minimal requirements for knowing and voluntary waiver (and by assigning the burden of proving compliance with those requirements), does not apply to waivers that occurred before October 16, 1990. *See* Pub.L. No. 101–433, § 202(a).

before the EEOC and, ultimately, by commencing the instant action.

■ Plaintiff's first argument—that his signature on the release was fraudulently induced in reliance on Defendant's misrepresentation of its intentions with respect to the elimination of the Travel Management Systems Department—has been addressed in detail above. For the reasons previously set forth in this Memorandum and Order, the Court finds that Plaintiff has adduced no evidence of any genuinely disputed factual issue that the purported elimination of the Travel Management Systems Department in October 1988 amounted to a subterfuge to induce Plaintiff's execution of the release and separation from IBM. The release will not be deemed ineffective on grounds that Plaintiff's execution of it was illegally induced.

Nor is the Court persuaded by Plaintiff's contention that the document he signed in January 1989 differed substantially from the one he had received in August 1988 and retained for over four months preceding the effective date of his retirement from IBM. The release signed by Plaintiff in January 1989 begins with a paragraph indicating acknowledgment of a lump sum financial assistance payment in the amount of $178,001.40, and reads thereafter as follows:

> In exchange for the special payment made by IBM under the Financial Assistance Program, I hereby knowingly and voluntarily release IBM, and its employees and agents from any claims I may have arising under my employment with IBM, including, but not limited to claims based on age, race, or sex discrimination. I understand that I am not releasing IBM from any claims I may have under the IBM Retirement Plan or any benefit programs described in the About Your Company booklet for which I am eligible. In the event of rehire by IBM as a regular IBM employee, I understand that IBM reserves the right to require repayment of a prorated portion of the separation payment if the time away from IBM is less than the number of weeks received as payment. I also understand, if

applicable, that IBM reserves the right to require repayment of the vesting equivalent payment since I will receive credit for prior IBM service upon rehire.

(Gorr Aff. Ex. "C".)

The document received by Plaintiff in August 1988 contains a substantially identical acknowledgment paragraph with a space left blank for the insertion of the total amount due upon retirement: a figure corresponding to two times the separating employee's annual salary or two times normal separation pay, less any special assistance payment, if applicable. Also included in the document Plaintiff received in August is a paragraph *precisely* identical to the first substantive paragraph of the January release quoted immediately above, and a paragraph identical to the second quoted paragraph, except that the final sentence, beginning "I also understand ... that IBM reserves the right to require repayment of the vesting equivalent payment," is not included. Finally, the document received in August contains the language of a no-compete clause, "recommended for all managers, non-managers at level 59 or higher, and others as determined by management"—to be inserted "if applicable"—which does not appear in the release form signed by Plaintiff in January 1989. (Gorr Aff. Ex. "A".)

The absence of the no-compete clause in the release signed by Plaintiff redounds, of course, entirely to Plaintiff's benefit. As for the addition of the provision concerning the vesting equivalent payment, the contingency referred to in that sentence would occur only upon re-establishment of an employee-employer relationship between Plaintiff and Defendant, and Plaintiff does not allege either that this discrepancy resulted in any reduction of the special payment amount he received, or that it adversely affected the terms of his separation from Defendant in any way. On this record, Plaintiff's contention that the document he received in August differs substantially from the one he signed in January borders on frivolity. The Court finds that Plaintiff had an entirely adequate peri-

od of time in which to consider the terms of the release before executing it.

■ No more compelling is Plaintiff's argument to the effect that the $178,001.40 he acknowledges receiving and retaining was in fact a severance payment made in contemplation of a continuing relationship between him and Defendant—and as such invalid consideration for a release of claims against the company—or his argument that, in any event, the release he signed in January is ineffective insofar as it purports to constitute a waiver of a cause of action which had not yet accrued as of January 5, 1989, the date of the document's execution. With respect to the latter contention, the Court reiterates its finding that Plaintiff's cause of action for age discrimination accrued, if at all, in October 1988 when the allegedly discriminatory elimination of Travel Management Systems went into effect; the document signed by Plaintiff on January 5, 1989, could and did effectively release Defendant from liability to Plaintiff potentially arising out of that event. As for the nature of the consideration he received and retained, Plaintiff adduces no evidence and makes no argument presenting a genuine factual issue that the payment was, in fact, made not in exchange for the release of claims but rather as a severance payment "premised on the possibility of [Plaintiff's] return to the company." (Pl's. Mem. at 19.) The language of the Release quoted by Plaintiff, to the effect that IBM retained the right to require repayment of a portion of the special payment in the event of a rehire, creates no obligation on Defendant's part to reinstate the employer-employee relationship; its inclusion in the body of the release does not convert that clearly denominated release agreement into another kind of legal instrument, and neither does Plaintiff's belief that he would be rehired, as a matter of company policy, should a job become available for him, transform a special payment in consideration of release into a severance fee. The undisputed evidence establishes that Plaintiff knew as early as August 1988 that his acceptance of the FAP would be conditioned on his signature of a legal document releasing Defendant from poten-

tial liability; he read, understood, and executed a release in January 1989, and he received at that time and has since retained a special payment of $178,001.40 above and beyond any amounts to which he would otherwise have been entitled.

■ Although Defendant's failure affirmatively to advise Plaintiff to retain legal counsel in connection with the execution of the release weighs against the company's position, the Court finds neither Plaintiff's lack of counsel nor his undisputed lack of input into the terms of the release dispositive of the voluntariness inquiry. Plaintiff concededly is not a lawyer, but he does hold both undergraduate and advanced degrees, his professional business background in Defendant's employ is extensive, and he can properly be considered neither inadequately educated nor lacking in relevant experience within the meaning of *Bormann*. Plaintiff does not allege that Defendant ever discouraged him in any attempt to seek independent advice, either in August 1988 in connection with his receipt of the FAP interest form and information packet or at any time thereafter. In view of the lengthy period of time between Plaintiff's initial receipt of the model release form and his signature of an essentially identical document, his admission in deposition testimony that he read and understood the release, and the straightforward language of the document and the waiver contained therein, the Court finds and concludes that the release signed on January 5, 1989, does constitute a "voluntary and knowing" release under the totality of the circumstances surrounding its execution. This conclusion is bolstered by the extent of the consideration—$178,-001.40—Plaintiff received in exchange for his waiver of rights, and by the absence of any allegation that such sum or any part of it would have been due to Plaintiff, pursuant to either law or contract, upon his separation from the company had he not elected to sign the release and take the special payment pursuant to the FAP.

Plaintiff's final argument in opposition to the motion for summary judgment based on his execution of the release—that the initiation of proceedings before the EEOC

put Defendant on notice of Plaintiff's belief that the release agreement was legally ineffective, and thus served formally to repudiate that document—is similarly unavailing.[12] Acknowledging, in general terms, that one who challenges the execution of an agreement as induced by duress "must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so," *DiRose v. PK Management Corp.*, 691 F.2d 628, 633–34 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983), Plaintiff asserts that he "did immediately disavow the release ... by filing his EEOC complaint almost immediately after he learned of IBM's discriminatory practices." (Pl.'s Mem. in Opp'n at 33.) Plaintiff misunderstands the nature of his burden under controlling case law.

As a preliminary matter, Plaintiff has not alleged that the execution of the release was procured under duress, and on this record it does not appear that he could do so. No evidence suggesting any of the three forms of duress recognized by the Restatement—threat, physical compulsion, or undue influence—is present here. *See Joseph v. Chase Manhattan Bank, N.A.*, 751 F.Supp. 31, 34 (E.D.N.Y.1990). Although the courts of this Circuit do recognize avoidance of contractual liability on the grounds of economic duress, Plaintiff has not established the elements of that defense—i.e., " 'that the agreement was obtained: (1) by means of wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative.' " *Id.* (quoting *Nelson v. Stanley Blacker, Inc.*, 713 F.Supp. 107, 110 (S.D.N.Y.1989)).

■ Even assuming, *arguendo*, the existence of an allegation (or any evidence

whatever to support a contention) that Plaintiff's signature on the release was procured under duress, the Court would be constrained to reject Plaintiff's assertion that the filing of the EEOC complaint suffices to establish a valid repudiation of the release agreement. Essentially, Plaintiff would have the Court find that by filing a charge in contravention of the terms of the agreement he effectively rescinded that document and freed himself of any further obligation to abide by its provisions, without thereby relinquishing his claim to the $178,001.40. For obvious reasons, the Court declines the invitation so to hold, and similarly rejects Plaintiff's imaginative contention that it was in fact Defendant which "waived its right with respect to the alleged release by failing to abide by its affirmative duty to demand the return of any sums it felt should have been returned." (Pl.'s Mem. at 33.) Notwithstanding the Court's holding that Plaintiff's federal cause of action is time-barred, the Court concludes that the Complaint must, in the alternative, also be dismissed in view of Plaintiff's knowing and voluntary execution of a valid release.

### Motions Address to the Counterclaim

As previously noted, Defendant moves for summary judgment on the counterclaim, and Plaintiff cross-moves in the alternative for an order either striking the counterclaim or extending Plaintiff's time to interpose a reply. Neither party apparently having considered or briefed the question of this Court's jurisdiction over the counterclaim following dismissal of the Complaint, the Court addresses the jurisdictional issue *sua sponte*.

■ Rule 13(a) of the Federal Rules of Civil Procedure requires that "[a] pleading shall state as a counterclaim any claim

---

**12.** Defendant argues that Plaintiff's retention of the special payment and other benefits constitutes ratification of the release and independently supports summary judgment on behalf of Defendant whether or not the release was knowingly and voluntarily signed. Defendant urges adoption of the Fifth Circuit's reasoning in *Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217 (5th Cir.1991), in which the court found that, notwithstanding questions about the voluntariness of a release signed by an employee as part of a

separation agreement, the employee's behavior in retaining the special payment and other benefits precluded her suit. This issue was presented to the Second Circuit in *Chaput v. Unisys Corp.*, 964 F.2d 1299 (2d Cir.1992), but not decided by the Court, which dismissed the appeal for lack of jurisdiction. Having determined that the release was voluntarily signed and not repudiated, this Court expresses no opinion as to the sufficiency of ratification alone.

which at the time of serving the pleading the pleader has against the opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Fed.R.Civ.P. 13(a). A compulsory counterclaim, which—unless specifically excepted in the Rule—will be barred if not immediately pleaded, requires no independent basis of federal jurisdiction so long as a colorable federal issue is raised by the claim to which it is ancillary. *Harris v. Steinem,* 571 F.2d 119, 121–22 (2d Cir.1978). Unrelated counterclaims, denominated permissive, need not be pleaded and may form the basis of a separate action; if raised in a federal district court, however, permissive counterclaims do require an independent jurisdictional basis. *Id.* at 122.

Defendant having asserted no independent jurisdictional basis to support the counterclaim in the instant case, that claim must if permissive, be dismissed upon dismissal of the Complaint. *Id.* at 125. If compulsory, the counterclaim is not *required* to be dismissed, but may be dismissed in the exercise of the Court's discretion where, as here, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3) (Supp.1991) (effective Dec. 1, 1990). *See also Scott v. Long Island Savings Bank, FSB,* 937 F.2d 738, 743 (2d Cir.1991) (applying same reasoning to affirm dismissal of counterclaim in case filed before effective date of 28 U.S.C. § 1367). Taking the "broad view" of the relationship between claim and counterclaim that has generally been adopted in this Circuit, *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979), the Court suggests without concluding that Defendant's counterclaim for breach of the release agreement—being logically related to the claim of age discrimination upon which the instant action is founded—would appropriately be deemed compulsory within the meaning of Rule 13(a). This determination is unnecessary to the disposition of

Defendant's motion for summary judgment on the counterclaim, however, since the Court concludes that even if not required to be dismissed the counterclaim in this case should not survive pre-trial dismissal of the federal cause of action underlying the Complaint.[13]

*Summary*

For all of the foregoing reasons, Defendant's motion addressed to the Complaint is granted, and the Complaint is dismissed as time-barred or, in the alternative, on grounds that Plaintiff knowingly and voluntarily released Defendant from liability arising out of the employment relationship. Defendant's motion for summary judgment on the counterclaim is denied, and the counterclaim is dismissed for lack of federal subject matter jurisdiction. Plaintiff's cross-motion, including the motions for costs, for leave to amend the Complaint, for enlargement of the time in which to complete discovery, and for an order compelling discovery from Defendant, are denied.

SO ORDERED.

---

**13.** Having determined that the counterclaim should be dismissed on jurisdictional grounds, the Court does not address Plaintiff's argument that the counterclaim is in fact a misdesignated affirmative defense.